## IN THE UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF IOWA
## CENTRAL DIVISION

UNITED STATES OF AMERICA,

*Plaintiff*,

v.                                                    Case No.

DANIEL GINGERICH

*Defendant*.

---

## COMPLAINT FOR INJUNCTIVE RELIEF

Plaintiff, United States of America, by authority of the Attorney General of the United States and through its undersigned attorneys, files this Complaint and alleges as follows:

### INTRODUCTION

1.     This is a civil action against Daniel Gingerich for violations of the Animal Welfare Act ("AWA"), 7 U.S.C. § 2159.

2.     In the two years since the U.S. Department of Agriculture ("USDA") issued Gingerich AWA license 42-A-1632 to breed and sell dogs at approved sites, he has amassed at least 100 citations for non-compliance with the AWA. The vast majority of these citations were issued during inspections conducted since March 2021.

3.     In response to the numerous non-compliant items, the USDA's Animal and Plant Health Inspection Service ("APHIS") Administrator issued a 21-day suspension of AWA license 42-A-1632 on September 7, 2021.

4.     USDA then filed an administrative complaint seeking permanent revocation of that license on September 24, 2021.  *See* Exhibit ("Ex.") J, Administrative Complaint.

5.      The non-compliant items range from denying APHIS inspectors access to approved and unapproved sites to assess the welfare of the dogs, to failing to provide adequate veterinary care, nutrition, and a safe environment to those dogs.

6.      To avoid USDA oversight and inspection, Gingerich has denied APHIS inspectors access to sites, failed to disclose all locations at which he is housing dogs, and has attempted to hide sick dogs from inspectors at regulated sites. In one instance, APHIS inspectors directed Gingerich to seek immediate veterinary care for a dog in poor condition. Instead of providing the dog adequate veterinary and other care, such as nutritious food, Gingerich attempted to hide the dog from inspectors in a filthy horse stall during a follow-up inspection. *See* photo below.



7.      Gingerich has also failed to comply with the requirement to use the methods detailed in the AWA regulations to identify individual dogs, frustrating USDA's efforts to track

2

the dogs and ensure their welfare. *See* Ex. B, September 15, 2021 Site 1 Routine Inspection Report at 6-12; *see also* 9 C.F.R. § 2.50(a)(1).

8.      Gingerich has repeatedly failed to meet the minimum standards of care for his dogs on adequate nutrition, potable water, and veterinary care, resulting in unnecessary suffering and death.

9.      Upon information and belief, on September 4, 2021, a rescue organization purchased 13 dogs from Gingerich, including ten puppies and three adults. Three of the dogs were in such poor condition that they required emergency veterinary care. One puppy died for Parvovirus, a highly contagious disease easily preventable by an appropriate vaccine regime, as required under the AWA.

10.     Gingerich's indifference to the well-being of his dogs is apparent in his failure to remove even dead dogs from his facility. In a recent inspection, APHIS inspectors discovered two dead dogs amongst the dogs that Gingerich was hiding in horse stalls. *See* photo below (showing the dogs after Gingerich removed them from the horse stalls and placed them outside); *see also* Ex. C, July 28, 2021 Site 1 Focused Inspection Report at 5.



11.     Upon information and belief, many of the unhealthy dogs observed by APHIS

inspectors are suffering from treatable or preventable conditions, such as malnutrition, Parvovirus, and distemper. Rather than spend the money to provide the dogs with much-needed care or allow USDA or rescue organizations to take possession of the dogs to get them the needed care, upon information and belief, Gingerich has allowed dogs to die without being treated by a licensed veterinarian or he has elected to euthanize them.

12.     Although Gingerich has demonstrated that he has more dogs than he can or will properly care for, he continues to breed his dogs.

13.     Gingerich's actions have placed and are continuing to place the health of numerous animals in serious danger. He is in violation of the AWA and its implementing regulations and standards.

14.     For the foregoing reasons, the United States complains and seeks a temporary restraining order as well as other injunctive relief.

## JURISDICTION AND VENUE

15.     The Court has jurisdiction over this action pursuant to 7 U.S.C. § 2146(c) (actions arising under the AWA); 28 U.S.C. § 1331 (federal question jurisdiction); and 28 U.S.C. § 1345 (United States as plaintiff).

16.     Venue is proper in the United States District Court for the Southern District of Iowa pursuant to 7 U.S.C. § 2159 (where Gingerich conducts business) and 28 U.S.C. § 1391.

17.     The Court may grant the requested relief under the AWA, 7 U.S.C. §§ 2146(c), 2159; and 28 U.S.C. §§ 2201, 2202 (declaratory and injunctive relief).

## THE PARTIES

18.     The Plaintiff is the United States of America. Authority to bring this action is vested in the Attorney General of the United States pursuant to 28 U.S.C. §§ 516, 519; and 7

U.S.C. § 2159.

19.     Upon information and belief, Defendant Daniel Gingerich is an individual whose

business mailing address is 3125 Davis Road Seymour, Iowa 52590 (hereinafter, "Site 1").  Mr.

Gingerich owns, deals in, and/or breeds the animals that are the subject of this action in the

Southern District of Iowa.

## LEGAL BACKGROUND

20.     The AWA establishes minimum standards of care and treatment to be provided

for certain animals bred and sold for use as pets, used in biomedical research, transported

commercially, or exhibited to the public. *See generally* 7 U.S.C. § 2131 *et seq*.  It was enacted

to "insure that animals intended . . . for use as pets are provided humane care and treatment." 7

U.S.C. § 2131(1). The AWA is administered by the Secretary of Agriculture or his

representative. 7 U.S.C. § 2132(b). The AWA authorizes the Secretary to "promulgate such

rules, regulations, and orders as he may deem necessary in order to effectuate the purposes of

[the AWA]." 7 U.S.C. § 2151. The Secretary has delegated his authority to the APHIS

Administrator. APHIS's Animal Care inspectors conduct inspections of facilities to determine

compliance with the AWA and its implementing regulations.

21.     The AWA defines a "dealer" as "any person who, in commerce, for compensation

or profit, delivers for transportation, or transports, except as a carrier, buys, or sells, or

negotiates the purchase or sale of, (1) any dog or other animal whether alive or dead for

research, teaching, exhibition, or use as a pet." 7 U.S.C. § 2132(f); *see also* 9 C.F.R. § 1.1

(definition of dealer).

22.     Anyone who falls within the statutory definition of a dealer must obtain and

maintain a valid license from the Secretary. 7 U.S.C. § 2134; *see also* 9 C.F.R. § 2.1(a)(1)

(licensing requirements).

23.     Regulated activities may only be conducted at sites that have been inspected and approved by APHIS. 9 C.F.R. § 2.1(b)(1).

24.     A class "A" dealer, known also as a breeder, is "a person subject to the licensing requirements under part 2 and meeting the definition of a 'dealer,' and whose business involving animals consists only of animals that are bred and raised on the premises in a closed or stable colony and those animals acquired for the sole purpose of maintaining or enhancing the breeding colony."  9 C.F.R. § 1.1 (definition of Class "A" dealer).  A class "A" dealer may not purchase and resell animals born and raised at a different facility (otherwise known as "brokering") under a class "A" license. *See id.* (definition of "class 'B' license").

25.     A class "A" dealer must identify all live dogs "held on the premises, purchased, or otherwise acquired, sold or otherwise disposed of, or removed from the premises for delivery…to another dealer, or for sale, through an auction sale or to any person for use as a pet, … by an official tag . . . affixed to the animal's neck by means of a collar made of material generally considered acceptable to pet owners as a means of identifying their pet dogs" or "by a distinctive and legible tattoo marking acceptable to and approved by the Administrator." 9 C.F.R. § 2.50(a)(1).

26.     The Secretary has promulgated regulations and standards to govern the humane handling, care, treatment, and transportation by dealers, which includes the minimum requirements for handling, housing, feeding, watering, sanitation, ventilation, shelter from extreme weather and temperatures, adequate veterinary care, and separation by species. 7 U.S.C. § 2143(a)(1)-(a)(2)(A). Dealers must comply in all respects with the regulations and standards for the humane handling, care, treatment, and transportation of dogs. 9 C.F.R. §§ 3.1-

3.20.

27.     With regard to food, it must be uncontaminated, wholesome, palatable, and of sufficient quantity and nutritive value to maintain the normal condition and weight of the animal. 9 C.F.R. § 3.9(a). Further, supplies of food must be stored so as to minimize contamination by excreta and pests, and protected from rain and snow. 9 C.F.R. § 3.9(b). Measures must be taken to ensure that the food is not molding. *Id.*

28.     With regard to water, potable water must be continuously available to the dogs unless restricted by the attending veterinarian, 9 C.F.R. § 3.10(a), and water receptacles must be kept clean and sanitized, 9 C.F.R. § 3.10(c).

29.     With regard to cleaning and sanitation, primary enclosures must be cleaned and both primary enclosures and food and water receptacles must be sanitized. 9 C.F.R. § 3.11. The primary enclosures must be cleaned daily to remove excreta and food waste, and to reduce disease hazards, insects, pests and odors. 9 C.F.R. § 3.11(a). Primary enclosures and food and water receptacles must be sanitized at least once every two weeks, and more often than that, if necessary, to prevent debris, food waste, and excreta from accumulating. 9 C.F.R. § 3.11(b)(2). The surrounding buildings and grounds must be in good repair and free of trash and junk to protect the dogs from injury. 9 C.F.R. § 3.11(c).

30.     With regard to facilities, indoor and outdoor housing facilities must be structurally sound and maintained in good repair to protect animals from injury and to contain the animals. 9 C.F.R. § 3.1(a). The housing facilities must be free of jagged edges or sharp points that might injure the animals, 9 C.F.R. § 3.1(c)(1)(ii), and floors must be cleaned to ensure that all animals can avoid contact with excreta, 9 C.F.R. § 3.1(c)(3). The housing facilities must have properly constructed, installed, and maintained disposal and drainage systems that allow for animal waste

and water to be eliminated and minimize odors and disease hazards. 9 C.F.R. § 3.1(f). The primary enclosures of the dogs must be constructed and maintained so that they have floors that protect the dogs' feet and legs from injury, and that, if of mesh or slatted construction, do not allow the dogs' feet to pass through any openings in the floor. 9 C.F.R. § 3.6(a)(2)(x).

31.     With regard to veterinary care, each dealer must employ an "attending veterinarian," who has direct or delegated authorities regarding the animals at the subject facility. 9 C.F.R. § 1.1 (definition of "attending veterinarian"). The dealer "must follow an appropriate program of veterinary care for dogs that is developed, documented in writing, and signed by the attending veterinarian." 9 C.F.R. § 3.13(a). The written program of veterinary care must be made available for inspection by APHIS inspectors. *Id.*

32.     The written program of veterinary care must include, among other things, a "complete physical examination from head to tail of each dog by the attending veterinarian not less than once every 12 months," "[v]accinations for contagious and/or deadly diseases of dogs (including rabies, parvovirus and distemper) and sampling and treatment of parasites and other pests (including fleas, worms, coccidian, giardia, and heartworm) in accordance with a schedule approved by the attending veterinarian," and "[p]reventative care and treatment to ensure healthy and unmatted hair coats, properly trimmed nails, and clean and healthy eyes, ears, skin, and teeth." 9 C.F.R. § 3.13(a); *see also id.* § 2.40(b). The written program of veterinary care must also address the "use of appropriate methods to prevent, control, diagnose, and treat diseases and injuries, and the availability of emergency, weekend, and holiday care." *Id.* § 2.40(b)(2).

33.     With regard to the number of employees, a facility must include a sufficient number of employees who are practicing husbandry under the supervision of an individual who

has the knowledge, background, and experience in proper husbandry and care of dogs to supervise others. 9 C.F.R. § 3.12.

34.     The AWA requires the Secretary to make investigations and inspections as necessary to determine whether any dealer has violated any provision of the AWA or any regulation or standard issued thereunder. 7 U.S.C. § 2146(a). The inspector shall have access to the places of business and the facilities, animals, and records. *Id.*; 9 C.F.R. § 2.126.

35.     Dealers must make, keep, and retain records for at least one year pertaining to the purchase, sale, transportation, identification, and previous ownership of the animal, which fully and correctly discloses information concerning the animal purchased or otherwise acquired, owned, held, leased, or otherwise in his or her possession or under his or her control, or which is transported, sold, euthanized, or otherwise disposed of (including records of any offspring). 7 U.S.C. § 2140; 9 C.F.R. §§ 2.75(b)(1)-(3), 2.80.

36.     Dealers must also keep copies of medical records for dogs for at least one year after the dog is euthanized or otherwise disposed of and make those records available for APHIS inspection. 9 C.F.R. § 3.13(b), (c).

37.     Under the AWA, United States district courts "are vested with jurisdiction specifically to enforce, and to prevent and restrain violations of [the AWA], and shall have jurisdiction in all other kinds of cases arising under [the AWA]," except in one instance not applicable here.  7 U.S.C. § 2146(c).

38.     Whenever the Secretary has reason to believe that any dealer is "placing the health of any animal in serious danger" in violation of the AWA or regulations or standards issued thereunder, the Secretary shall notify the Attorney General, who may seek an injunction in the United States district court. 7 U.S.C. § 2159(a).

## FACTUAL BACKGROUND

39.     USDA issued Class A license number 42-A-1632 to Daniel Gingerich in October

2019.  At all times relevant to the allegations in this complaint, Gingerich was a dealer as that

term is defined in the AWA and its implementing regulations, and held a Class A license, AWA

license 42-A-1632, as an "individual."

40.     Based on recent inspections of approved sites, Gingerich currently has in his

possession, control, or care a total of approximately 257 dogs across the approved sites.

41.     In the short time that he has been licensed, Gingerich has attempted to evade

USDA regulation of his sites by repeatedly denying APHIS inspectors access to sites for routine

inspections or failing to have an adult available to accompany APHIS inspectors, in violation of

9 C.F.R. § 2.126. For instance, APHIS inspectors were unable to access Gingerich's facility

located at 3125 Davis Road, Seymour, Iowa 52590 on March 11, 2020, October 6, 2020, and

December 9, 2020.

42.     Unannounced inspections are critical to ensuring that APHIS inspectors can

accurately assess a licensee's compliance with the AWA, its regulations, and standards, and

ensure the well-being of AWA-regulated animals.

43.     Gingerich finally granted APHIS inspectors access to certain sites starting in

March 2021. In the last six months, the inspectors have identified at least 100 non-compliant

items, including failing to provide adequate veterinary care to hundreds of dogs and puppies

in his possession, failing to adequately maintain acquisition and disposition records for

numerous dogs, and failing to meet the minimum housing requirements for dogs.

44.     In the last six months, APHIS inspectors have cited Gingerich for failing to

present complete and accurate disposition and acquisition records for hundreds of missing

dogs. *See, e.g.* Ex. B at 8-12 (no or incomplete disposition records for over 400 dogs); Ex. I, August 11, 2021 Site 1 Routine Inspection Report at 7-8 (no or incomplete disposition records for over 450 dogs).

45.     During the September 15, 2021 inspection, APHIS inspectors counted only 109 dogs. Based on documentation provided by the facility, there should have been 155 dogs. However, no disposition records were provided for the missing 46 dogs. Ex. B at 9. Gingerich also had not cured other previously cited record issues. *See id*. at 7-12.

46.     During an August 11, 2021 inspection, APHIS inspectors counted only 112 adult dogs even though Gingerich had filled out forms that the facility contained 224 dogs. Ex. I at 8. During that same inspection, inspectors counted only 129 puppies in the whelping building even though 212 puppies were listed on the facilities' cage cards. None of the cage cards indicated that a puppy had died, was euthanized, or sold. *Id.* at 10.  In some cases, Gingerich sold dogs but did not complete disposition forms for them. *Id.* at 8 (sold 33 dogs but no identification numbers recorded for the dogs in disposition forms). When disposition forms were presented, they were incomplete or inaccurate. *Id.* at 10 (no transport information for at least 25 puppies).

47.     Other dogs had no acquisition information. *See* Ex. B at 7, 9-10 (no or incomplete acquisition information for over 400 dogs); Ex. I at 7 (no acquisition information for approximately 187 dogs). When acquisition records were available, they were incomplete, making it difficult to identify dogs and trace where Gingerich was moving them. *Id.* at 8 (no date of acquisition for 189 dogs).

48.     Many dogs had no official form of identification, making it difficult for APHIS inspectors to identify the dogs and connect them to medical records. *See* Ex. B at 6-7 (numerous litters of puppies are comingled and have no form of identification); Ex. I at 5

(at least 65 dogs over the age of 16 weeks had no official form of identification).

49.     Gingerich has also attempted to hide dogs in poor condition from APHIS inspectors. During an inspection of Site 1 on July 28, 2021, APHIS inspectors discovered a number of dogs hidden in filthy horse stalls covered in a thick layer of dirt, horse manure, and dog feces. *See* photo; *see also* Ex. C at 54. Inspectors also observed an



emaciated Golden Retriever (#142) who had been hidden from inspectors in one of the horse stalls. *See* Ex. C at 47, 36, and photo below; *see also supra* ¶ 6.  The dog was initially observed in the emaciated state by inspectors at the facility in early April 2021, but was under veterinary treatment at that time.  Subsequent inspections in late May 2021 and late July 2021 revealed that the dog's condition had gotten worse, but that she had not been reevaluated by a licensed veterinarian. *See* Ex. C at 2.



During this same inspection, APHIS inspectors also discovered two dead dogs among living

dogs that Gingerich had hidden in horse stalls. *See supra* ¶ 10.

50.     Gingerich has also attempted to avoid inspection by refusing to identify unapproved sites housing dogs intended for breeding. On June 10, 2021, APHIS inspectors received information regarding an unapproved location at which Gingerich was housing approximately 150 breeding dogs and dogs intended for breeding. Gingerich had failed to disclose this location to USDA. Upon information and belief, Gingerich is housing dogs at other unapproved locations that have not been disclosed to USDA.

51.     On June 14, 2021, USDA attempted to inspect one of Gingerich's unapproved sites. The facility representative told an APHIS inspector that Gingerich ordered him not to allow anyone access to the kennel area where the dogs were located. USDA inspectors contacted Gingerich and advised him of the repercussions of refusing to grant APHIS inspectors access to his facility. Nevertheless, Gingerich stated that APHIS could go ahead and cite him for refusing.

52.     On September 7, 2021, the APHIS Administrator suspended Gingerich's license for 21 days. The suspension went into effect on September 8, 2021, when it was served at Site 1 located at 3125 Davis Road, Seymour, Iowa 52590. The suspension notice states that between March 11, 2020, and September 2, 2021, Gingerich failed to:

> [P]rovide a program of adequate veterinary care, properly identify animals, maintain proper records, alleviate the impact of climatic conditions on the animals, allow proper access and inspection of records and property, maintain structurally sound housing facilities, provide continuous potable water, provide proper cleaning and sanitization, provide appropriate shelter, and maintain minimum requirements set out for primary enclosures of the animals.

Ex. A (Suspension Letter).

I.      **Gingerich is Placing the Health of His Dogs in "Serious Danger" by Failing to Employ an Attending Veterinarian who Provides Adequate Veterinary Care to His Dogs.**

53.     At all times relevant to the allegations in this complaint, Gingerich was a dealer as that term is defined in the AWA and its implementing regulations, and held a Class A license, AWA license 42-A-1632, as an "individual."

54.     Upon information and belief, Gingerich's attending veterinarian has not examined the majority of the dogs in his control, possession, or care, as required by the AWA. *See* 9 C.F.R. § 3.13(a)(2).

55.     APHIS inspectors identified dogs that required veterinary care, but when the inspectors would request the written medical records for those dogs the facility had no written medical records containing examination, diagnosis, and treatment plans. *See* Ex. E, Part 1, July 7, 2021 Site 1 Routine Inspection Report at 31.

56.     Upon information and belief, Gingerich does not provide the attending veterinarian timely and accurate information regarding problems of animal health, behavior, and well-being, as required by the AWA. 9 C.F.R. § 2.40(b)(3).

57.     When dogs were under a treatment plan from a licensed veterinarian, there was no documentation of that treatment plan. *See* Ex. F, July 29, 2021 Site 1 Focused Inspection Report at 6 (Samoyed puppy under treatment plan but no documentation of treatment plan). For other dogs which had received treatment for their medical conditions, there was not even documentation of the actual medical problem.  *See id.* (only documentation that female Shih tzu #389 and #479 had received treatment was a written statement that they were "treated 7-28-21").

58.     Gingerich has failed to maintain a complete written program of veterinary care to

help ensure the health and well-being of his dogs, as required by the AWA. *See* Ex. B at 23

(incomplete program of veterinary care); Ex. I at 23 (program of veterinary care for Site 1 did

not contain any plan for sampling and treatment of blood parasites, and also had no complete

treatment plan in the section for intestinal parasites); Ex. D, Aug. 30, 2021 Site 3 Routine

Inspection Report at 4-5 (program of veterinary care for Site 3 located at 3002 Highway 2,

Promise City, Iowa 52583 did not contain any plan for heartworm and intestinal parasites, was

missing the name and dosage of products to be used, and did not accurately reflect how often

adult dogs and puppies receive treatment); *see also* 9 C.F.R. § 3.13(a).

59.     When asked for the program of veterinary care during an inspection on July 7,

2021, the facility representative could not locate the program to provide to inspectors. The

facility representative did not know the plan for treating or preventing ticks for a dog who had

engorged ticks attached to her ear and face, and because the program was missing APHIS

inspectors could not review the plan. Similarly, due to the missing program, inspectors could

not review the plan to treat multiple dogs who had heavily matted coats and another dog with

severely overgrown toenails. *See* Ex. E at 12.

60.     Gingerich has received numerous citations for failing to provide adequate

veterinary care to his dogs. On September 15, 2021, APHIS inspectors conducted an inspection

of Site 1. Ex. B. During the visit, the inspectors observed the following:

> a.  A lethargic Bichon puppy (no tag) whose extremities, including her ears,
>     were cold to the touch, abdomen was swollen and had a rapid respiration rate
>     with an increased effort on inhalation. She had a small amount of discharge
>     coming from her nose. She remained on the ground while her littermates
>     moved around the enclosure. Gingerich had not sought any treatment for the
>     puppy because neither he nor his employees had not noticed the puppy's
>     condition. *Id.* at 2.
>
> b.  A lethargic, depressed Golden retriever puppy (tag #707) whose extremities,
>     including her ears, were cold to touch, though her body felt hot. Her legs

were swollen as was her muzzle. Palpation of her abdomen revealed that it was possibly full of fluid. She was in an enclosure with 15 other puppies. She remained on the ground while the majority of the other puppies moved around the enclosure. Although she was being treated for parasites and a cough, no licensed veterinarian had physically examined her. Gingerich also had not had a veterinarian examine her in her current state. *Id.* at 2.

    c.   A lethargic, depressed, Golden retriever puppy (tag # 576) whose extremities, including her ears, felt cold to the touch, though her body felt hot. The puppy was drooling, coughing nearly continuously, had discharge coming from her nose, and her third eyelids on both eyes were elevated. Although she was being treated for parasites and a cough, no licensed veterinarian had physically examined her. Gingerich also had not had a veterinarian examine her in her current state. *Id.* at 2-3.

    d.   An emaciated Golden retriever puppy (tag #581). The dog has very little fat covering her frame and her ribs, hips, and backbone were easily felt and the backbone was prominent with sunken muscles along both sides. The puppy's extremities, including her ears, felt cold to the touch, though her body felt hot. A small amount of discharge from both nostrils was noticed. Although she was being treated for parasites and a cough, no licensed veterinarian had physically examined her. Gingerich also had not had a veterinarian examine her in her current state. *Id.* at 3.

    e.   An emaciated poodle (tag # 371). The dog had very little fat or muscle covering her frame and the ribs, backbone, and hip bones were easily felt beneath the haircoat. Gingerich had not sought any treatment for the puppy because neither he nor his employees had noticed the puppy's condition. *Id.* at 3-4.

    f.   An Australian shepherd (tag #272) with poor dental health. A number of his teeth are coated in dark brown tartar. Neither Gingerich nor his employees had noticed the condition of the dog's teeth and, thus, the dog has not been evaluated by a licensed veterinarian and was not under a treatment plan. *Id.* at 4.

    g.   Two dogs with extremely overgrown toenails, which can cause pain and discomfort as well as affect the dog's natural gait. *Id.* at 4-5.

61.    During the September 15, 2021 inspection, APHIS inspectors also did a random check of five litters and discovered that at least 11 puppies had died of Parvovirus in those five litters alone, according to facility representatives. Parvovirus is a deadly disease but is easily preventable when dogs are properly vaccinated, as required by the AWA. Gingerich's attending

veterinarian confirmed that neither Gingerich nor any of his employees had contacted him about the Parvovirus cases. Ex. B at 5. The APHIS inspectors also discovered that Gingerich and his employees are failing to follow the vaccination schedule set by the attending veterinarian in the program of veterinary care.[1] *Id.* at 22.

62.     Gingerich was recently cited for storing a number of vaccines at inappropriately high temperatures, which directly interferes with the effectiveness of the vaccines and results in an increased risk of disease. *See* Ex. E at 5 (vaccines for Parvovirus, distemper, and rabies inappropriately stored). Dewormer was also stored at inappropriately high temperatures. *See* Ex. I at 6.

63.     Gingerich has also failed to properly document sick animals' official identification numbers on their medical records, which prevents APHIS officials from determining if an animal has received adequate veterinary care including vaccinations. During the September 15, 2021 inspection, APHIS inspectors discovered that Gingerich had sold puppies who then tested positive for Parvovirus and/or distemper. Ex. B at 24. When the inspectors requested the puppies' cage cards, which are supposed to list vaccination dates, the identification numbers did not match the disposition records. *Id.*

64.     During an inspection on August 11, 2021, APHIS inspectors observed numerous dogs with no identification in visibly poor health. *See* Ex. I at 2-5 (female Samoyed in poor dental health and lame in left front leg; female Cocker spaniel with eyeball sunken into head and inflamed right eye; female tri-colored Cocker spaniel with grey discharge from eyes, reddened sclera, and not well-defined iris and pupils; female Doberman with cloudy right eye and lesion on surface of left eye); *see also* Ex. G, July 30, 2021 Site 1 Focused Inspection at 2.

---

[1] The program of veterinary care was missing for approximately one month.

65.     No medical records have been presented for the dogs in poor health. Thus, upon information and belief, those dogs were not seen by a licensed veterinarian. For example, during an inspection on August 25, 2021, APHIS inspectors observed a severely underweight poodle with muscle wasting evident in its hind legs and a prominent bony spine that had not been evaluated by a licensed veterinarian. Ex. H, August 25, 2021 Site 1 Focused Inspection Report at 2. In that same inspection, APHIS inspectors observed an Australian shepherd with a severely matted hair coat as well as multiple hairless lesions. *Id.* at 2-3. The facility representative had not noticed the shepherd's condition, and he had not been evaluated by a licensed veterinarian. *Id.* Inspectors also encountered an English Springer spaniel with hair loss and fresh blood oozing from open lesions. *Id.* at 3-4. Again, the facility representative had not noticed the spaniel's condition and there was no evaluation by a licensed veterinarian. *Id.* The facility representative was also unaware of and had not had either a male Pomsky with a lesion behind his right eye or a female Pomeranian with a large lesion on her back and fecal material trapped in matted hair evaluated by a licensed veterinarian. *Id.* at 4.

66.     During an inspection on July 28, 2021, inspectors observed a female Bernese Mountain Dog with no identification that had an abnormal condition of her nose. *See* photo below. The dog was not under any veterinary treatment. *See* Ex. C at 3.



67.     One dog was in such poor condition that it died during the course of the

inspection. On August 11, 2021, APHIS inspectors noticed that a poodle puppy was gasping for

breath and occasionally cried out. Ex. I at 2. When APHIS inspectors removed the puppy, he

jerked his head and then rolled his head upward toward the ceiling. *Id.* An APHIS Veterinary

Medical Officer gently examined the puppy, and confirmed that he had died. *Id.* In response, the

facility representative stated that employees had been cleaning the puppy's kennel that morning

but that she had not been alerted that the puppy was in distress. *See id.*

## II.     Gingerich is Placing the Health of His Dogs in "Serious Danger" by Failing to Provide the Dogs with Adequate Nutrition or Potable Water.

68.     Gingerich is placing the health of the dogs in serious danger by failing to provide

them with the basic nutrients they need to develop properly.

69.     APHIS inspectors have observed emaciated dogs at Gingerich's facilities. *See* Ex.

B at 2, 17; Ex. C at 47, 36.

70.     APHIS inspectors have repeatedly cited Gingerich for providing his dogs with

moldy food. The animals appear to refuse to eat the moldy food, which may be contributing to

their poor body condition. During the September 15, 2021 inspection, Gingerich received

numerous citations for failing to provide his dogs with food free from contamination. *See* Ex. B

at 18-19 (emaciated dog had access to moldy food mixed with some fresh food; another dog had

moldy food inside a feeder with a hard section of caked feed beneath fresh food; an Australian

shepherd had access to moldy food mixed into fresh food; two Golden retrievers had access to

caked feed embedded into a dried black substance; six puppies had access to caked and

deteriorating food; one Shiba Inu had excessive amount of wood shavings mixed into food; four

puppies had excessive amount of wood shavings mixed into wet food such that the puppies could

not consume the food without also ingesting the wood shavings; ten additional dogs had an

excessive amount of wood shavings covering food).

71.     Gingerich was cited for feeding his dogs contaminated food in July and August

2021 as well. APHIS inspectors observed dog food in metal self-feeders coated in mold. *See* Ex.

E at 24; Ex. I at 19. Seven feeders, intended to serve approximately 20 dogs, had a buildup of

powdered feed and dirt, exposing the dogs to bacteria and contaminants. *See* Ex. E at 27.

72.     For dogs in outdoor enclosures, APHIS inspectors saw fully saturated and soggy

food in the feeders. *See* Ex. F at 5.

73.     On August 30, 2021, APHIS inspectors observed dogs being fed via a plastic scoop that was previously used to feed horses that contained a thick buildup from an additive applied to horse feed. Ex. D at 4; *see also* photo below.



74.     Gingerich has repeatedly been cited for failing to properly store dog food in a manner that protects the food from spoilage, contamination, and vermin infestation. *See* Ex. B at 15. The dogs have been fed food from open bags of dog food that did not contain a lid, allowing visible flies on the dog food inside the bag. *See* Ex. E at 19. Dog food was stored in areas covered in spilled, moldy dog food, and with trash from fast food sitting on top. *See* Ex. I at 14.

75.     Multiple facilities during repeated inspections contained no potable water for the dogs. *See e.g.*, Ex. C at 9; Ex. F at 6; Ex. G at 3 (female Golden Doodle #5 and her five puppies had no available water in their enclosure, and "all took a quick drink" when water was presented); Ex. I at 20 (at least five adult dogs and five puppies had no access to potable water). When there was available water it was contaminated with dirt and pieces of green floating algae, and coated with green algae, *see* Ex. C at 9, and contained a buildup of brown sediment and debris, *see* Ex. E at 26; Ex. F at 6.

76.     During an inspection on a day where the National Weather Service had issued a heat advisory due to the heat index hitting up to 125 degrees, APHIS inspectors observed dogs drinking non-potable water, which was a brown color and had a layer of brown sediment built up on the inside of the water receptacle. *See* Ex. F at 6.

### III.     Gingerich is Placing the Health of His Dogs in "Serious Danger" by Exposing Them to Unsanitary and Unsafe Conditions.

77.     Defendant has placed the health of his animals in "serious danger" by maintaining his dogs in facilities containing excessive amounts of trash, feces, and debris.

78.     Gingerich does not have enough employees working at the sites to maintain the facilities in compliance with the AWA. *See* Ex. B at 21. During a recent inspection of Site 1, APHIS inspectors found 24 different non-compliant items, including eight dogs in need of veterinary care. *Id.* There are over 262 dogs at Site 1, but Gingerich has employed only three staff members. *Id.*

79.     Upon information and belief, Gingerich's employees do not know enough about animal husbandry to adequately care for the dogs. During the September 15, 2021 inspection, the facility representative stated that he did not understand the program of veterinary care's statement about ectoparasites and had not been using Frontline on the dogs. Ex. B at 23. The employee also did not understand the statements regarding blood parasites or intestinal parasites. *Id.* Facility representatives made similar statements during the August 2021 inspection. *See* Ex. I at 23; *see also supra* ¶ 59.

80.     Gingerich has failed to maintain housing facilities so that the dogs are protected from injury. During the September 15, 2021 inspection, APHIS inspectors observed an enclosure that had a gap in the wall that was large enough that the puppies in the enclosure could become entrapped or injured. Ex. B at 12.

81.     On July 7, 2021, inspectors observed a decaying carcass of a miniature Australian shepherd a few feet away from the fence of an outdoor enclosure with visible holes dug underneath the fence that were covered using makeshift materials including boards and wire. When questioned about the dead dog, the facility representative indicated that the shepherd had crawled through one of these holes and been attacked and killed by dogs in an adjacent enclosure. Ex. E at 14-15. During subsequent inspections on July 28, 2021, and August 11, 2021, the inspectors continued to find numerous enclosures with gaps or holes dug underneath the fencing or walls large enough for dogs to escape into the adjacent enclosure. *See* Ex. C at 6-7; *see* Ex. I at 11-12. In fact, one dog was found outside the enclosure and had access to the road. Ex. C at 6.

82.     During the July 28, 2021 inspection, APHIS inspectors observed numerous covered outdoor enclosures with sections of exposed concrete covered in wet, runny feces. The coat of a Golden retriever (#801) was entirely wet and covered in feces. *See* Ex. C at 8-9.

83.     On August 11, 2021, inspectors saw that four dogs housed in a large open barn had no access to shelter, making it impossible for the dogs to seek shelter during adverse weather conditions. *See* Ex. I at 18.

84.     Gingerich has received repeat citations for failing to maintain clean and sanitary conditions in the dogs' shelters. During the September 15, 2021 inspection, APHIS inspectors observed one shelter accessed by 16 puppies, which contained straw bedding dark in color, wet, dirty, and moldy. Ex. B at 19-20. Bedding material contaminated by waste, mold, dirt, and plastic may cause the animals to become wet and soiled, which raises the risk of disease and may irritate or worsen existing medical conditions. In fact, all of the puppies with access to the contaminated bedding are under treatment for a cough, intestinal parasites, and external

parasites. *Id.* at 20.

85.     During the July 2021 inspection, APHIS inspectors observed at least four outdoor shelters that contained wet, dirty, and moldy straw bedding material. *See* Ex. E at 28. When APHIS inspectors in one of the shelters that was home to eight dogs peeled the contaminated straw up, a "colony of ant-like insects" was revealed. *Id.*  In another shelter, home to nine dogs, underneath the contaminated straw were "flying gnat-like insects." *Id.* The facility representative was unaware of the contaminated condition of the bedding. *Id.*

86.     Many of the buildings in Gingerich's facilities had drains that flowed directly through outdoor enclosures where dogs were kept. The drains created large, thick piles of wet fecal and food waste, which attracted a large number of flies. APHIS inspectors observed some dogs laying in the waste to keep cool. Even though APHIS inspectors had identified the problems caused by these drains—a buildup of waste that attracted pests, created odors, and increased the risk of disease for the dogs that called these outdoor enclosures home—Gingerich had not fixed these problems. *See* Ex. E at 20. During a subsequent inspection on July 29, 2021, liquid waste was still flowing through the dog enclosures, creating wet, muddy areas covered in green algae and attracting numerous wasps. *See* Ex. F at 4.

87.     During the September 15, 2021 inspection, APHIS inspectors observed a large pool of feces, hair, urine, and other waste material that had collected outside a building with outdoor dog enclosures. Ex. B at 15. A large number of insects were swarming and climbing up the walls of the building. *Id.* Another shelter housing two Huskies had a large pile of feces and other organic material beneath it that had failed to drain. *Id.*

88.     Throughout Gingerich's facilities, dogs were housed in enclosures that had sharp points that could injure the dogs. For example, during the September 15, 2021 inspection,

APHIS inspectors observed enclosures, which had screws with sharp ends protruding into the interior at the level of the dogs in the enclosure. Ex. B at 14. During a July 7, 2021 inspection, APHIS inspectors saw one enclosure inside the sheltered building that housed one adult dog and four puppies contained sharp ends of a wire located right next to the metal feeder, so that dogs came into contact with the sharp edges each time they came to eat food.  In another enclosure that was home for four dogs, a broken door frame created a sharp point at the level of the dogs. At yet another enclosure, five dogs came into contact with at least five screws that protruded from the entrance of the enclosure. Multiple other enclosures that housed dogs contained broken chain link fence that created sharp points at the level of the animals. *See* Ex. E at 17-18. When inspectors came back on August 11, 2021, they once again saw numerous sharp points throughout Gingerich's facilities. *See* Ex. I at 15 (metal feeder had sharp wire ends that could come into direct contact with dogs every time they approached the feeder to access the food; broken door frame).

89.     Many of the enclosures contained a thick, heavy buildup of spilled and moldy food, and organic waste with an excessive number of flies buzzing around. Other enclosures were horse stalls inside a barn, where the entirety of the floors were covered with dog feces, remnant horse manure, and dirt. *See* Ex. C at 10.

90.     Unweaned puppies were housed in a closet full of boxes, bags, and screens such that inspectors could not enter the closet much further than the doorway. The closet also had a leaking water pipe near the door with a large pile of soaked wood shavings. *See* Ex. E at 15-16.

91.     Gingerich has repeatedly been cited for non-compliant flooring in dog enclosures. During the September 15, 2021 inspection, APHIS inspectors observed non-compliant flooring in all enclosures in the whelping building, housing approximately 111 adults and 87 puppies.

Ex. B at 16-17. There are gaps between the boards of the floors wide enough that the legs of

both the puppies and adult dogs will easily fall through them and thus creates the potential to

cause serious injury to the animals. *Id.* Gingerich was also cited for the non-compliant flooring

during the July 7, 2021 inspection. *See* Ex. E at 24. During that inspection, APHIS inspectors

witnessed the legs of multiple puppies fall through these openings. *Id.* The same whelping

building also contained wood shavings completely saturated with urine and feces that the

puppies were running around in. *Id.* at 28.

92.     Gingerich's facilities contained an excessive number of flies and insects

throughout all of the buildings. Alongside the gnat-like insects and ant-like insects that had

infested the straw bedding, flies were seen in food and water bowls, and on the dog food. Ex. E

at 28. Gingerich used an insecticide to control the flies, but placed the containers of insecticide

along walls where they could easily fall into the enclosures where dogs were kept. Ex. I at 13.

During the August 11, 2021 inspection, APHIS inspectors observed two plastic containers

holding insecticide on the floor of a dog enclosure. *Id.*

93.     Inspectors conducted an investigation of one of Gingerich's facilities when a heat

advisory had been issued for the area where it was located, and found a number of dogs

showing signs of severe heat stress. For example, a female poodle in a transport crate was on

the driveway in direct sunlight. No shade was provided for her. She was open-mouth breathing

and began crying out while she was observed by inspectors. The temperature that day was 95

degrees Fahrenheit with a heat index of 119 degrees Fahrenheit. Multiple dogs housed inside of

one of the buildings had high respiration rates and were panting heavily. The temperature inside

the building was 92 degrees Fahrenheit with a heat index of 112 degrees Fahrenheit. In another

building, used for whelping, numerous puppies younger than eight weeks had high respiration

rates. In that building, the temperature was an even higher 95 degrees Fahrenheit with a heat index of 117 degrees Fahrenheit. *See* Ex. C at 5-6.

94.     During the July 29, 2021 inspection, 12 adult Cavalier spaniels were exhibiting signs of heat stress, as were the majority of puppies under seven weeks in the whelping building. In an outdoor enclosure, dogs were observed lying down in the accumulation of liquid waste that was leaking from the drainpipe. Ex. F at 3.

95.     During another visit, a female Shih tzu was so affected by the high heat, of up to 93 degrees with a heat index of 109 degrees, that she was sprawled across the floor and had unstable, uncoordinated movements in her hind legs. She ultimately exited her enclosure by dragging her hind legs over the lip of the shelter entrance. Until she was found by APHIS inspectors, the facility representative was unaware of the dog's condition. The dog was moved to the whelping building, but inspectors observed that even an hour after being moved she still appeared weak and unstable. Ex. E at 2, 13-14.

## CLAIM 1
**Defendant Violated and Will Continue to Violate the AWA by Placing the Health of His Animals in Serious Danger.**

1.     The United States incorporates by reference all allegations of the Complaint.

2.     Gingerich is placing the health of his animals in serious danger in violation of the AWA and its regulations and standards. 7 U.S.C. § 2159(a).

3.     Gingerich is placing the health of his animals in serious danger by failing to provide adequate veterinary care, in violation of 9 C.F.R. §§ 2.40(b); 3.13.

4.     Gingerich is placing the health of his animals in serious danger by failing to provide adequate nutrition and potable water, in violation of 9 C.F.R. §§ 3.9(a), 3.9(b), 3.10(a), 3.10(c).

5.      Gingerich is placing the health of his animals in serious danger by exposing them to unsanitary and unsafe conditions, in violation of 9 C.F.R. §§ 3.11(a), 3.11(b)(2), 3.11(c), 3.1(a), 3.1(c)(1)(ii), 3.1(c)(3), 3.1(f), 3.6(a)(2), 3.12.

6.      Unless enjoined, Gingerich will continue to place the health of his animals in serious danger in violation of the AWA and its regulations and standards.

7.      The United States is entitled to an injunction to prevent and restrain Gingerich from operating in violation of the AWA and its implementing regulations and standards. 7 U.S.C. § 2159(b).

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

1. Declare that Gingerich has violated and continues to violate the AWA by placing the health of the animals in serious danger. 7 U.S.C. § 2159; 9 C.F.R. §§ 1.1, 2.1-2.12;

2. Enjoin and restrain Gingerich from placing the animals' health in serious danger in violation of AWA regulations. 7 U.S.C. § 2159, specifically:

   a. provide to undersigned counsel within 7 days of the Court's order a list of every location at which they have any dogs that are intended for breeding or sale as of the date of the filing of this motion, *see* 9 C.F.R. § 1.1 (definition of dealer)[2];

   b. provide to undersigned counsel within 7 days of the Court's order an animal inventory for each location identified in paragraph (1), listing the breed, sex, age, and unique identification number, *see* paragraph (3), of each and every

---

[2] The United States is seeking in a motion for temporary restraining order the relief requested in paragraph 2(a)-(j). If the Court grants the motion, the United States will seek a continuation of those terms in a preliminary injunction to the extent those terms were not fully accomplished before the granting of the injunction.

dog at each of the identified locations;

c.  assign within 7 days of the Court's order a unique identification number to

   each dog listed on the inventories provided pursuant to paragraph (2),

   consistent with 9 C.F.R. § 2.50(a)(1);

d.  ensure that, within 14 days of the Court's order, every dog listed on the

   inventories receives a "complete physical examination from head to tail," as

   required by 9 C.F.R. § 3.13(a)(2), by a licensed veterinarian other than Dr.

   William McClintock or any other veterinarian associated with Country

   Village Animal Clinic, Centerville, Iowa;

e.  provide complete veterinary records for the "complete physical

   examinations" required by paragraph (4) and any veterinary care otherwise

   provided to any dog to undersigned counsel within 7 days of the animal

   being seen by a veterinarian;

f.  provide to undersigned counsel within 7 days of the Court's order up-to-date

   written programs of veterinary care that comply with 9 C.F.R. § 2.40(b) and

   3.13(a) for each location identified in paragraph (1);

g.  ensure that a licensed veterinarian, other than Dr. William McClintock or

   any other veterinarian associated with Country Village Animal Clinic,

   Centerville, Iowa, documents the vaccination status of every dog identified

   in paragraph (2), timely vaccinates all dogs consistent with the vaccination

   schedule set out in the relevant written program of veterinary care, and

   accurately documents the vaccinations and make those documents available

   to USDA Animal and Plant Health Inspection Service inspectors upon

request;

h.  immediately cease from acquiring by birth or transfer or disposing by euthanasia or transfer any dogs listed on the inventories in paragraph (2) without the consent of the United States or a court order;

i.  in the case of any dogs who were already pregnant at the time of the Court's order, provide notice to undersigned counsel within 72 hours of the birth of any puppies, including the number of puppies born, the identification number of the dam, and the identification numbers assigned to the puppies, *see* 9 C.F.R. § 2.50(a)(1); *see also* 9 C.F.R. § 2.75;

j.  if any dogs listed on the inventories provided pursuant to paragraph (2) die, have a licensed veterinarian, other than Dr. William McClintock or any other veterinarian associated with Country Village Animal Clinic, Centerville, Iowa, confirm the death in person and document the condition of the dog; the veterinarian's record of death must be provided to undersigned counsel with 72 hours of the death of the animal; and

k.  provide to undersigned counsel accurate and complete acquisition and disposition forms for each and every dog acquired by birth or transfer or disposed of by death, euthanasia, or transfer in the 12 months consistent with 9 C.F.R. § 2.75.

3.  Award the United States its costs in this action; and

4.  Grant other relief that the Court deems just and proper.

DATED: September 27, 2021

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division

*/s/ Mary Hollingsworth*
MARY HOLLINGSWORTH
Senior Trial Attorney
SHAMPA A. PANDA
Trial Attorney
United States Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
P.O. Box 7611, Ben Franklin Station
Washington, D.C. 20044-7611
Mary.hollingsworth@usdoj.gov | 202-598-1043
Shampa.panda@usdoj.gov | 202-598-3799
Fax: 202-305-0275
*Attorneys for the United States of America*

RICHARD D. WESTPHAL
Acting United States Attorney

DAVID L.D. FAITH II
Assistant United States Attorney
U.S. Courthouse Annex, Suite 286
110 E. Court Avenue
Des Moines, Iowa 50309
Telephone: (515) 473-9353
Facsimile: (515) 473-9282
Email: david.faith@usdoj.gov