**IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

UNITED STATES OF AMERICA,

*Plaintiff*,

v.

DANIEL GINGERICH

*Defendant*.

Case No. 4:21-cv-00283-SMR-SHL

**EXPEDITED RELIEF REQUESTED**

**MEMORANDUM OF AUTHORITIES IN SUPPORT OF EX PARTE MOTION FOR
TEMPORARY RESTRAINING ORDER**

**TABLE OF CONTENTS**

I.   THE AWA: STATUTORY AND REGULATORY BACKGROUND ................................. 3

II.   FACTUAL BACKGROUND ............................................................................................. 4

III.   STANDARD OF REVIEW ........................................................................................ 6

IV.   ARGUMENT ................................................................................................................ 7

   A.   Gingerich is a Dealer Who is Placing the Health of His Dogs in "Serious Danger" in Violation of the AWA ............................................................................................ 7

      1.   Gingerich is a "Dealer." ...................................................................................... 7

      2.   Gingerich is Placing the Health of His Dogs in Serious Danger by Failing to Provide Them with Adequate Veterinary Care. ....................................................... 8

      3.   Gingerich is Placing the Health of His Dogs in Serious Danger by Failing to Provide Them With Potable Water or Food of Sufficient Quantity and Quality. .............................. 12

      4.   Gingerich is Placing the Health of His Dogs in Serious Danger By Failing to House The Dogs in Safe and Sanitary Facilities. .................................................................... 14

      5.   Injunctive Relief is Required Under the AWA. ............................................................ 16

   B.   In the alternative, an injunction is warranted under the Four-Factor Test ......................... 17

V.   CONCLUSION ............................................................................................................... 18

The United States respectfully moves for an ex parte temporary restraining order under Federal Rule of Civil Procedure 65(b)(1) against Daniel Gingerich, his agents, servants, employees, and those working in active concert with him. The Defendant is licensed under the Animal Welfare Act ("AWA" or "Act") as a dealer who is authorized to sell animals born and raised at sites approved by the U.S. Department of Agriculture ("USDA"), also known as a "breeder." 9 C.F.R. § 1.1 (definition of Class "A" licensee). In just the last six months, he has been cited for at least 100 violations of AWA regulations and standards that are meant to ensure the humane treatment and handling of AWA-protected animals. Gingerich has failed to meet even the minimum standards of care for his dogs, including adequate veterinary care, sufficient nutritious food, potable water, and sanitary living conditions, thereby placing the health of those animals in serious danger in violation of the AWA, and its regulations and standards (9 C.F.R. §§ 1.1-3.142). 7 U.S.C. § 2159(a). Thus, the United States is entitled to a temporary restraining order to prevent Gingerich from continuing to operate as a dealer in violation of the AWA, and its regulations and standards. *See* 7 U.S.C. § 2159(a).



The Court should issue a temporary restraining order without notice to Gingerich because he is likely to dispose of some or all of his dogs or hide them from the United States if there is any gap between the expiration of USDA's 21-day license suspension at 11:59

p.m. on September 29, 2021, and the issuance of an order on the United States' motion.[1] Ex. X (Declaration of Mary Hollingsworth). In the short time he has been licensed, Gingerich has shown contempt for the law by hiding AWA-protected dogs at unapproved sites, instructing his employees not to disclose the location of dogs at approved sites, lying to USDA's Animal and Plant Health Inspection Service ("APHIS") inspectors about his ownership interest in certain dogs and the whereabouts of other dogs. Maxwell Decl. ¶¶ 9, 15-18, 20-24, 27-30, 33-34; Ex. E (Declaration of Randy Coleman) at ¶ 5.

   Moreover, Gingerich's history of refusing to provide required documentation showing the whereabouts of hundreds of dogs further supports this request for an ex parte temporary restraining order to ensure that Gingerich does not have an opportunity to dispose of additional dogs before the United States has an opportunity to ensure the dogs' welfare. *See* Maxwell Decl. ¶¶ 9.

   Despite Gingerich's awareness of the AWA and its requirements, he nonetheless has shown nothing but callous disregard for the safety and welfare of his dogs as well as contempt for the law. As demonstrated below, Gingerich is placing the health of his dogs in serious danger and, thus, the United States is entitled to a temporary restraining order. The relief the United States seeks in its Motion for Temporary Restraining Order merely reflects what Gingerich should already be doing as an AWA licensee. Absent the relief requested, the evidence shows that more

---

[1] In response to Gingerich's numerous AWA violations, USDA issued a 21-day suspension of his AWA license, which was served on September 8, 2021. Exhibit ("Ex.) A (Gingerich Notice of Suspension). The suspension prohibits Gingerich from breeding or otherwise acquiring, transporting, or disposing of any animals during the suspension period. Gingerich and his employees or associates have contacted USDA multiple times during the suspension regarding disposing of some of his dogs. Although Gingerich is prohibited from selling or transporting animals during the suspension, with the best interests of the dogs in mind, USDA offered to grant Gingerich a limited exemption to allow him to surrender some apparently sick dogs to a rescue organization that would provide them appropriate veterinary care. *See* Ex. B (Declaration of Kelly Maxwell) at ¶ 39. Gingerich responded that he would euthanize the dogs if USDA did not allow him to transfer the dogs to whomever he chooses. *Id.* ¶39.

of Gingerich's dogs will likely suffer needlessly or will die. The United States respectfully requests that its motion be granted.

## I.     THE AWA: STATUTORY AND REGULATORY BACKGROUND

Congress enacted the AWA to, *inter alia*, "insure that animals intended . . . for use as pets are provided humane care and treatment. 7 U.S.C. § 2131(a). The AWA (7 U.S.C. §§ 2131 *et seq*.) regulates the commercial exhibition, transportation, purchase, sale, housing, care, handling, and treatment of "animals," as that term is defined in the Act, and in the regulations issued under the Act (9 C.F.R. Part 1, *et seq*.) ("regulations"). Congress delegated to the Secretary of Agriculture authority to "promulgate rules, regulations, and orders as he may deem necessary in order to effectuate the purposes of [the AWA]." 7 U.S.C. § 2151. The Secretary has promulgated regulations and standards to govern the humane handling, care, treatment, and transportation by dealers. *See* 9 C.F.R. §§ 1.1-3.142. These provisions set forth minimum requirements for the treatment of animals by dealers, including how animals are to be handled, housed, fed, transported, and provided veterinary care. 9 C.F.R. §§ 3.1-3.142 ("standards").

The AWA defines a "dealer" as:

> [A]ny person who, in commerce, for compensation or profit, delivers for transportation, or transports, except as a carrier, buys, or sells, or negotiates the purchase or sale of, (1) any dog or other animal whether alive or dead for research, teaching, exhibition, or use as a pet, or (2) any dog for hunting, security, or breeding purposes. Such term does not include a retail pet store (other than a retail pet store which sells any animals to a research facility, an exhibitor, or another dealer).

7 U.S.C. § 2132(f); *see also* 9 C.F.R. § 1.1 (definitions). Anyone who falls within the statutory definition of a dealer must obtain and maintain a valid class A or class B license from the Secretary. 7 U.S.C. § 2134 (prohibiting dealers from conducting AWA-regulated activities unless they "have obtained a license from the Secretary and such license shall not have been suspended or revoked"); *see also* 9 C.F.R. §§ 1.1 (definition of class "A" licensee and class "B" licensee); 9 C.F.R. § 2.1(a)

(licensing requirements).

The AWA authorizes USDA to conduct investigations or inspections as necessary to determine whether any dealer has violated or is violating any provision of the AWA or its regulations or standards. 7 U.S.C. § 2146(a) (The USDA "shall, at all reasonable times, have access to the places of business and the facilities, animals, and those records required to be kept . . . of any such dealer."). Dealers and other regulated persons are required to maintain records regarding the purchase, sale, and transportation of regulated animals, and they must make their facilities and records available for inspection at all reasonable times. *Id.* §§ 2140, 2146(a); 9 C.F.R. §§ 2.75, 2.126.

If the USDA has reason to believe that any licensee has violated or is violating the AWA or its regulations or standards, the agency may temporarily suspend the dealer's license for up to 21 days, and may seek to revoke the license along with civil penalties after notice and opportunity for hearing. 7 U.S.C. § 2149(a)-(b). When an AWA license is suspended or revoked, the affected licensee is not permitted to buy, sell, exhibit, deliver for transportation, or transport regulated animals during the period of suspension or revocation. 9 C.F.R. § 2.10(c).

If the Secretary has reason to believe that a dealer "is placing the health of any animal in serious danger" in violation of the AWA, or its regulations or standards, the USDA shall notify the Attorney General, who may seek a temporary restraining order or injunction to prevent any such person from operating in violation of the Act's requirements. 7 U.S.C. § 2159(a). The district court "shall, upon a proper showing, issue a temporary restraining order or injunction under subsection (a) without bond." *Id.* § 2159(b).

## II.     FACTUAL BACKGROUND

Gingerich is a commercial dog breeder who operates at least three active, USDA-approved sites in Iowa, including in Seymour, Iowa. *See* Maxwell Decl. ¶¶ 8, 9. He also operates at least

two unapproved sites. *See Id.* ¶¶ 11, 15, 20-24, 33. USDA issued class A license number 42-A-1632 to Gingerich in October 2019. *Id.* ¶ 3. As a class A licensee, Gingerich is permitted to sell only those animals that are bred and raised at one of his USDA-approved sites.[2] 9 C.F.R. § 1.1 (definition of class "A" licensee).

For over a year, Gingerich evaded USDA regulation of his sites by repeatedly denying APHIS inspectors access to sites for routine inspections or failing to have an adult available to accompany APHIS inspectors, in violation of 9 C.F.R. § 2.126(a). Maxwell Decl. ¶¶ 4, 18, 41. APHIS inspectors were unable to access Gingerich's facility located at 3125 Davis Road, Seymour, Iowa (hereinafter, "Site 1") on March 11, 2020, October 6, 2020, and December 9, 2020. *Id.* ¶ 4. Just last week, APHIS inspectors were unable to access Site 3, located at 3002 Highway 2, Promise City, Iowa, to conduct an inspection. *Id.* ¶ 41.

APHIS inspectors were finally able to access certain sites starting in March 2021. In the six months since then, Gingerich has received at least 100 citations across those sites. *See* Ex. T (April 7, 2021 Site 1 Routine Inspection Report); Ex. U (April 21, 2021 New Site Inspection Report); Ex. V (June 14, 2021 New Site Inspection Report); Ex. W (July 9, 2021 New Site Inspection Report); Ex. L (October 10, 2019 Pre-License Inspection Report #2); Ex. Z (August 30, 2021 Site 3 Routine Inspection Report). The citations fall into two major categories: (1) failure to provide adequate care, including veterinary care and nutritious food, and (2) failure to properly identify and document the whereabouts of his dogs. Due to the repeated violations and failure to correct these noncompliances, APHIS suspended Gingerich's license for 21 days, starting on September 8, 2021. Ex. A.

---

[2] To purchase an animal from another and resell the animal, also known as brokering, a person must hold a class B license. 9 C.F.R. § 1.1 (definition of class "B" licensee). Gingerich has been warned multiple times that he is not authorized under his license to broker animals. Maxwell Decl. ¶¶ 5, 6, 9, 10.

### III.  STANDARD OF REVIEW

To obtain a temporary restraining order, a party must usually demonstrate (1) a likelihood of success on the merits; (2) irreparable injury in the absence of the restraining order; (3) the party's threatened injury outweighs the harm to the opposing party under the restraining order; and (4) the restraining order is in the public interest. *Kroupa v. Nielsen*, 731 F.3d 813, 818 (8th Cir. 2013) (citation omitted); *see also Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (*en banc*). However, "[w]hen a statute mandates injunctive relief as a remedy for a violation—or impending violation—of the statute, it has effectively constrained the courts' traditional discretion to determine whether such relief is warranted." *First W. Cap. Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1141 (10th Cir. 2017); *see also Bedrossian v. Nw. Mem'l Hosp.*, 409 F.3d 840, 843 (7th Cir. 2005) ("[U]nless a statute clearly mandates injunctive relief for a particular set of circumstances, the courts employ traditional equitable considerations (including irreparable harm) in deciding whether to grant such relief."). The Eighth Circuit has held that:

> [W]here Congress expressly provides for injunctive relief to prevent violations of a statute, a plaintiff does not need to demonstrate irreparable harm to secure an injunction. In such situations, it is not the role of the courts to balance the equities between the parties. The controlling issue is whether Congress has already balanced the equities and has determined, as a matter of public policy, an injunction should issue where the defendant is engaged in, or is about to engage in, any activity which the statute prohibits.

*Burlington N. R.R. Co. v. Bair*, 957 F.2d 599, 601-02 (8th Cir. 1992) (citation omitted).

AWA Section 2159 falls within the category of statutes that limit the traditional equitable discretion of the courts and, thus, the four-factor test in inapplicable here. *See* Op. & Order at 27-28, *United States v. Lowe*, No. 20-cv-00423 (E.D. Okla. Jan. 15, 2021), Dkt. 65 (interpreting 7 U.S.C. § 2159 as mandating injunctive relief upon showing of "serious danger"). "Section 2159 expressly states that '[t]he court shall, upon a proper showing [that a dealer is placing the health of any animal in serious danger in violation of the AWA, or its regulations or standards], issue a

temporary restraining order or injunction.'" *Id.* at 28. Because the AWA mandates injunctive relief upon a showing of "serious danger," the traditional four-factor test is inapplicable here. Thus, the "proper role of the courts [in § 2159 cases] is simply to determine whether a violation of the statute has or is about to occur." *Burlington*, 957 F.2d at 602.

## IV. ARGUMENT

As detailed below, the United States is entitled to a temporary restraining order to prevent Gingerich from continuing to operate in violation of the AWA. *See* 7 U.S.C. § 2159(a), (b). The temporary restraining order is necessary to ensure the health and welfare of the dogs under Gingerich's control or care.

### A. Gingerich is a Dealer Who is Placing the Health of His Dogs in "Serious Danger" in Violation of the AWA

Gingerich is a dealer who has amassed a long list of AWA violations for failing to provide his dogs adequate veterinary care, food of sufficient quantity and nutritional value, and access to safe and sanitary facilities. Gingerich's actions have not just placed the health of dogs under his care in serious danger, but many times his action or inaction resulted in death from easily preventable or treatable conditions. Accordingly, injunctive relief is mandated. 7 U.S.C. § 2159(b); *see also* Op. & Order at 28, *Lowe*, No. 20-cv-00423, Dkt. 65.

#### 1. Gingerich is a "Dealer."

Gingerich applied for and was issued an AWA class A license. *See* Ex. L. A class A licensee (or breeder) by definition is a dealer who is authorized to sell only those animals that have been bred and raised at the licensee's USDA-approved site. 9 C.F.R. § 1.1 (definition of Class "A" licensee). As a class A licensee, Gingerich is a dealer. The AWA defines dealer as any person who "in commerce, for compensation or profit, delivers for transportation or transports . . . buys, or sells, or negotiates the purchase or sale of: [a]ny dog . . . for . . . use as a pet; or any dog at the

wholesale level for hunting, security, or breeding purposes." *Id.* (definition of dealer). Moreover, even absent a class A license, Gingerich's delivery for transportation or sale of dogs, whether at USDA-approved or unapproved sites, constitutes dealing under the AWA. *See* Ex. L.

### 2. Gingerich is Placing the Health of His Dogs in Serious Danger by Failing to Provide Them with Adequate Veterinary Care.

Gingerich provides wholly inadequate veterinary care to the dogs in his facilities. The regulations and standards require, among other things, that dealers ensure that the animals in their custody receive adequate care, and that they take appropriate steps to prevent and treat diseases and injuries, communicate with the attending veterinarian, and educate their personnel. 9 C.F.R. §§ 3.13(a)(2)-(3), 2.40(a)-(a)(2), 2.40(b)(2)-(3). Gingerich has consistently violated the adequate veterinary care regulations and despite repeated warnings has failed to attend to the animals' well-being. This has put the health of the animals in serious danger.

During inspections, APHIS inspectors have observed that many of Gingerich's dogs are in dire need of veterinary care. Ex. M (July 28, 2021 Site 1 Focused Inspection Report) at 2-3 (observation of a severely emaciated Golden retriever and several dogs with untreated and painful eye conditions); Ex. N (August 11, 2021 Site 1 Routine Inspection Report Site) at 2 (puppy lying flat on its right side that was non-responsive and gasping for breath dies during examination by APHIS Veterinary Medical Officer); Ex. O (August 25, 2021 Site 1 Focused Inspection Report) at 2-5 (dogs had severe skin conditions, including lesions, and matted hair); Maxwell Decl. ¶ 31 (observation of "numerous dogs throughout Site [1] coughing").

Multiple animals "developed severe illness and/or died at [Gingerich's] facilities from disease such as parvovirus and distemper," both of which are "easily prevented using common and widely available vaccines, given at appropriate timeframes, combined with proper cleaning, sanitizing, and husbandry practices." Ex. C (Declaration of Heather Cole) ¶ 8. Gingerich

repeatedly stored vaccines and dewormer at inappropriately high temperatures, reducing their effectiveness. Ex. P (July 7, 2021 Routine Inspection Report Site 1, Part 1) at 6 (vaccines inappropriately stored); Maxwell Decl. ¶ 8 (identifying Parvovirus vaccine stored at wrong temperature); *Id.* ¶ 12 (same). The failure to vaccinate dogs properly, combined with the failure to store vaccines properly, led to the multiple disease outbreaks at Gingerich's facilities. Cole Decl. ¶ 8; Ex. D (Declaration of Autumn Unck) ¶ 5 (site manager "did not have veterinary medical records" for Parvovirus treatment administered to contain outbreak at unapproved site).[3]

During multiple inspections, APHIS inspectors have observed dogs in severe heat stress. Ex. P at 2 (dog suffering from severe heat stress after being left outside when the heat index was between 107° F and 109° F); *cf.* Mawell Decl. ¶ 19 (dogs in outdoor enclosures had no shade structures even though the temperature was "approximately 90 degrees"). Even when APHIS inspectors point out that dogs are showing obvious signs of severe heat stress, corrective measures are not taken to protect the dogs. During an inspection on July 23, 2021, inspectors observed that a dog "that had been cited for heat stress" in the past "had been placed back in the outdoor enclosure" even though there was a "heat advisory for the area that afternoon." *Id.* ¶ 26. But when the inspector pointed out this issue, the facility representative brushed off her concern and replied that the "the dog would be fine." *Id.* ¶ 26.

Gingerich fails to follow any program of veterinary care for the animals.[4] For example,

---

[3] Under 9 C.F.R. § 3.13(b), (c), Gingerich was required to maintain the medical records for at least one year. Moreover, if the dogs died from Parvovirus, that indicates that Gingerich failed to properly vaccinate the puppies. It is also possible that Gingerich is claiming that the puppies died from Parvovirus to cover for his inaccurate and incomplete recordkeeping. For example, when asked in April 2021 by APHIS inspectors about the location of puppies that he had purchased from other breeders—that those breeders had properly recorded on disposition forms—Gingerich replied that all of the puppies "died from Parvovirus." Maxwell Decl. ¶ 9.

[4] The program of veterinary care was missing for a period of time, impeding the inspector's ability to track animals for purposes of ensuring their health and safety. *See* Ex. P at 12.

during a September 15, 2021 inspection after the suspension of Gingerich's license, APHIS instructors found three puppies, who had never been seen by the attending veterinarian, displaying signs of serious illness. Ex. Q (September 15, 2021 Site 1 Routine Inspection Report) at 2-4. These three puppies, and three other animals, were referred for immediate veterinary care. *Id.* at 4. During this inspection, the facility representative[5] stated that at least a dozen other puppies that had been listed on cage cards were no longer at the facility because they had died from Parvovirus, a disease easily prevented by vaccines required to be administered by the AWA. *Id.* at 5. The facility representative further stated that, according to the attending veterinarian's program of vet care, the facility is not vaccinating appropriately for Parvovirus or distemper. *Id.* The APHIS inspectors followed up with the attending veterinarian who stated that Gingerich had not notified him of the disease outbreak. *Id.*

Gingerich's failure to provide accurate and timely information to the attending veterinarian

---

[5] Under 7 U.S.C § 2139, a principal-agent relationship has been established between Gingerich and his employees. That section instructs that:

> When construing or enforcing the provisions of [the AWA], the act, omission, or failure of any person acting for or employed by a . . . dealer . . . within the scope of his employment or office, shall be deemed the act, omission, or failure of . . . dealer . . . as well of such person.

7 U.S.C. § 2139. Under this provision, the "act, omission, or failure" of facility representatives and employees are considered to be Gingerich's acts for purposes of the AWA. That Gingerich's employees were the ones providing inadequate veterinary care or failing to provide potable water does not disturb the conclusion that Gingerich violated the AWA. *See e.g., Cox v. U.S. Dep't of Agric.*, 925 F.2d 1102, 1105 (8th Cir. 1991) (rejecting argument that dealers did not violate the AWA because the dates in the records were supplied and recorded by their employees because Section 2139 of the AWA imputes the acts of employees to their employers.); *Wilson v. U.S. Dep't of Agric.*, 61 F.3d 907, *1 (7th Cir. 1995) (unpublished opinion) (under Section 2139 of the AWA, "[a] corporation and the individuals exercising sole control and direction over the corporation are jointly assessed penalties."); *Hickey v. Dep't of Agric.*, 991 F.2d 803, *3 (9th Cir. 1993) (unpublished opinion) (imputing actions of licensee's mother to licensee under Section 2139 of the AWA).

about dogs showing abnormalities or clinical signs of disease or illness has led to their prolonged suffering and death. *See* Ex. O at 2 (severely underweight chocolate poodle with a prominent spine and hind legs affected by muscle wasting who had not been evaluated by a licensed veterinarian); Cole Decl. ¶ 9 (Gingerich's "[f]ailure to consult with his attending veterinarian has led to many unnecessary deaths and euthanasia of adult dogs and puppies at his facilities"); Maxwell Decl. ¶ 14 (Golden retriever first identified as "extremely emaciated" during April 7, 2021 inspection was "in even worse condition and had not been re-examined by a veterinarian").

Further confirmation that Gingerich's provision of veterinary care to his dogs is wholly inadequate comes from a rescue organization that purchased ten puppies and three adult dogs from Gingerich on September 4, 2021. Ex. F (Purchase Invoice, Gingerich to MN Rescue Org.) at 2-3. Gingerich's attending veterinarian Dr. William McClintock signed the invoice confirming that he had examined each of the dogs. *Id.* at 5. But, mere days later, several of the dogs required immediate, emergency veterinary care. Ex. K (Audi Veterinary Bill) (emergency consultation and hospitalization); Ex. H (Pepper Veterinary Bill) (overnight hospitalization at veterinarian); Ex. I (Shelby Veterinary Bill) (intravenous catheter and oxygen therapy); Ex. J (Sidney Veterinary Bill) (four-day hospitalization). One puppy was initially admitted to the emergency veterinary hospital for loss of appetite, but once at the hospital the veterinarian determined that the puppy was positive for Parvovirus. Ex. G (Kanji Veterinary Record). Despite being put on oxygen support and intubated with a feeding tube during his eight-day stay at the veterinary hospital, the puppy ultimately died from Parvovirus. *Id.* at 35. Since the rescue organization took possession of the 13 dogs three weeks ago, the dogs have required veterinary care totaling over $20,000. *See* Ex. K ($923.88 vet bill); Ex. H ($1,246 vet bill); Ex. I ($14,332.92 vet bill); Ex. J ($7,344.49 vet bill).

Despite having no veterinary license that the United States is aware of, Gingerich himself

diagnoses the dogs under his care. For example, on September 16, 2021 Gingerich called USDA inspector Kelly Maxwell and said that "all of his dogs were coughing because they had worms." Maxwell Decl. ¶ 39. When Maxwell pointed out that "a virus was the more likely cause" of the coughing, Gingerich "did not seem interested." *Id.* Even more troublingly, on multiple occasions Gingerich has even "chosen to euthanize dogs at his facilities in lieu of working with his attending veterinarian to perform diagnostics and/or develop treatment plans for easily diagnosable, treatable, and/or preventable diseases." Cole Decl. ¶ 9. In many instances, there is no evidence that any veterinary medical professional ever examined the dogs or diagnosed them as having a non-treatable disease before they were euthanized. And, even assuming that the dogs were suffering from a non-treatable disease, Gingerich completely failed to obtain even minimal veterinary medical care for them. Moreover, following their deaths, Gingerich did not have any necropsies performed, foreclosing any opportunity to confirm or disprove his explanations.

The dogs "that are dying" and the dogs that Gingerich "is euthanizing" are "in poor condition because of easily treatable and preventable factors," including "not being vaccinated properly for diseases such as parvovirus and distemper." *Id.* ¶ 10. These factors have led to an "exceptionally high" adult and puppy death rate at Gingerich's facilities that is "considerably higher than what . . . [is] expect[ed] for a commercial dog breeding facility that provides proper care for their animals." *Id.* ¶ 11. Gingerich's failure to provide adequate veterinary care to his dogs has put them in "serious danger."

### 3. Gingerich is Placing the Health of His Dogs in Serious Danger by Failing to Provide Them With Potable Water or Food of Sufficient Quantity and Quality.

Gingerich is also placing the health of his dogs in "serious danger" by failing to provide adequate nutrition and potable water.

The food that the dogs are given is not "wholesome, palatable, and free from contamination

and of sufficient quantity and nutritive value to maintain all animals in good health." 9 C.F.R. § 3.129(a). Further, supplies of food are not stored "so as to minimize contamination by excreta and pests, and protected from rain and snow." *Id.* § 3.9(b). Gingerich is also not providing water as dictated by the standards, which make clear that "[p]otable water must be continuously available to the dogs unless restricted by the attending veterinarian," *Id.* § 3.10(a), and water receptacles "must be kept clean and sanitized," *Id.* § 3.10(c).

APHIS inspectors have repeatedly cited Gingerich for providing his dogs with moldy food. For example, during the September 15, 2021 inspection, Gingerich received numerous citations for failing to provide his dogs with food free from contamination. *See* Ex. Q at 18-19 (emaciated dog had access to moldy food mixed with some fresh food; another dog had moldy food inside a feeder with a hard section of caked feed beneath fresh food; an Australian shepherd had access to moldy food mixed into fresh food; two Golden retrievers have access to caked feed embedded into a dried black substance; six puppies had access to caked and deteriorating food; one Shiba Inu had an excessive amount of wood shavings mixed into food; four puppies had excessive amount of wood shavings mixed into wet food such that the puppies could not consume the food without also ingesting the wood shavings; ten additional dogs had an excessive amount of wood shavings covering food). Gingerich also feeds his dogs food that is contaminated with mold. *See* Ex. P at 25 (APHIS inspectors observed dog food coated in mold in metal self-feeders). Gingerich is also not providing available potable water for the dogs. *See e.g.*, Ex. M at 9 (numerous dogs throughout facility have no potable water); Ex. R (July 29, 2021 Site 1 Focused Inspection Report) at 5-6 (at least 14 dogs in outdoor housing have non potable water in their water receptacles); Ex. S (July 30, 2021 Site 1 Focused Inspection Report) at 3 (female Golden Doodle #5 and her five puppies had no available water in their enclosure, and "all took a quick drink" when water was presented);

Ex. N at 20 (at least five adult dogs and five puppies had no access to potable water). Former employees of Gingerich have told APHIS inspectors that Gingerich kept puppies at Site 1 that "had not been fed or [given] wate[r] for three days." Maxwell Decl. ¶ 33.

By failing to provide his dogs with potable water and safe, uncontaminated food, Gingerich has placed the health of his dogs in "serious danger."

4.    **Gingerich is Placing the Health of His Dogs in Serious Danger By Failing to House The Dogs in Safe and Sanitary Facilities.**

Finally, the state of Gingerich's facilities is putting the health of his dogs in serious danger. The standards make clear that indoor and outdoor housing facilities must be structurally sound and maintained in good repair to protect animals from injury and to contain the animals. 9 C.F.R. § 3.125(a). With regard to cleaning and sanitation, primary enclosures must be cleaned and both primary enclosures and food and water receptacles must be sanitized. 9 C.F.R. § 3.11. The primary enclosures must be cleaned daily to remove excreta and food waste, and to reduce disease hazards, insects, pests and odors. 9 C.F.R. § 3.11(a). Gingerich has failed to follow these standards.

The dogs at Gingerich's facilities are subject to inadequate and unsafe living conditions. For example, during an inspection APHIS inspectors observed at least three outdoor enclosures where the dogs had dug holes underneath the fence. The holes were covered or filled using boards, wire, or concrete blocks. The inspectors discovered a decaying dog carcass a few feet away from the fence of one of these enclosures. The facility representative explained that the dog had crawled under the fence through one of these holes into the adjacent enclosure where it was attacked and killed by the dogs housed there. Ex. P at 15.

Gingerich also has a demonstrated history of hiding dogs in buildings and not disclosing these locations to APHIS inspectors during inspections. During an inspection, APHIS inspectors discovered that Gingerich was hiding dogs in two buildings on his property. Further inspection of

those buildings revealed that Gingerich was failing to comply with requirements for sanitizing facilities, watering, veterinary care, and pest control. Ex. M at 4-5; *see also* Maxwell Decl. ¶ 30 (observation of puppies stored "inside stacked wire crates" located inside of a "small closet-like area" in the basement of a house during July 29, 2021 inspection).

The employees at Gingerich's facilities are not operating in a way that prioritizes the well-being of the dogs at the facilities. As a threshold matter, there are not enough employees working at the sites to maintain the facilities in compliance with the AWA. *See* Ex. Q at 21. During a recent inspection of Site 1, APHIS inspectors found 24 different non-compliant items, including eight dogs in need of veterinary care. *Id.* Even though there are over 262 dogs at Site 1, Gingerich has employed only three staff members. *Id.* Further, the employees that Gingerich hires are not knowledgeable about animal husbandry. Gingerich hired a kennel manager at Site 1 to "take care of the business" but when questioned, the kennel manager stated that Gingerich "had not really told him anything about the AWA." Maxwell Decl. ¶¶ 13-14; *see also id.* ¶ 12 (Site 04 facility representatives stated that Gingerich "had not told them anything about the AWA requirements."); *id*. ¶ 32 (Site 05 facility representatives "were not prepared for [] new dogs [that Gingerich had dropped off] and did not have housing ready for [the dogs]"). The employees' lack of knowledge acts in direct detriment to the health of the dogs at Gingerich's facilities. For example, when questioned about a non-responsive, gasping puppy that died during an inspection, the facility representative stated that employees had cleaned the kennel earlier that morning but had failed to identify that the puppy was in distress. Ex. N at 2; *see also* Maxwell Decl. ¶ 25 (Site 06 employee said he "had no idea that dogs . . . could have so many veterinary problems).

Gingerich has failed to maintain his facilities in a way that provides the dogs under his care clean, sanitary, and adequate housing. This has placed the health of his dogs in "serious danger."

### 5. Injunctive Relief is Required Under the AWA.

The AWA expressly contemplates injunctive relief to prevent any person from placing the health of animals in serious danger in violation of this chapter or the regulations and standards prescribed. 7 U.S.C. § 2159(a), (b). The APHIS inspection reports and USDA declarants provide sufficient evidence for this Court to conclude that Gingerich is a dealer placing the health of his dogs in serious danger by failing to provide the dogs adequate veterinary care, food of sufficient quantity and nutritional value, and access to safe and sanitary facilities. Gingerich's history of violations cover every category of the AWA. Indeed, USDA declarant Heather Cole, who has "supervised over 2,000 inspections and . . . personally conducted inspections of more than 500 dog dealer facilities in [her] 11-year tenure at APHIS" has "never encountered" a licensee such as Gingerich who repeatedly refuses to comply with the requirements of the AWA and its implementing regulations and standards. Cole Decl. ¶¶ 5, 6. According to Cole, Gingerich's facilities are "the all-around least compliant facilities [she] has ever encountered." *Id.* ¶ 6. An immediate injunction is warranted because, in the period of time between when Gingerich is first cited for failing to provide adequate veterinary care for certain dogs and when USDA inspectors conduct a follow-up inspection, the dogs that Gingerich has been cited for "have often disappeared." Cole Decl. ¶ 15. For many of these dogs, Gingerich "t[ells] the [Animal Care] inspectors that the dogs [have] died in the intervening time period." *Id.*

To reinforce the need for an immediate injunction, Gingerich has been unwilling to donate the dogs at his facilities even though he has been unable to correct the serious, repeated violations at his facilities. Typically, "when licensees at severely noncompliant facilities are faced with repeated violations, the facilities cooperate with USDA to voluntarily surrender their animals and/or work with rescue organizations to donate their animals." *Id.* ¶ 12. USDA has had "multiple conversations" with Gingerich explaining how to voluntarily surrender or donate his animals to

rescue organizations. *Id.* ¶ 13. However, during his suspension period Gingerich has called USDA inspectors and said that if "[USDA] did not allow him to give the dogs at Site 001 to anyone he wants, he will just have them euthanized." Maxwell Decl. ¶ 39.

Gingerich has repeatedly failed to provide even the most basic care to his dogs, such as adequate nutrition, potable water, and veterinary care, resulting in unnecessary suffering and death. He has also failed to comply with the requirement to use the methods detailed in the AWA regulations to identify individual dogs, frustrating USDA's efforts to track the dogs and ensure their welfare. Because Gingerich has placed his dogs in "serious danger" an injunction should issue under AWA Section 2159.

**B.      In the alternative, an injunction is warranted under the Four-Factor Test**

Even if the Court determines that the traditional test applies to AWA "serious danger" cases, the United States has established it meets all four factors. The United States is likely to succeed on the merits of its claim that Gingerich is a dealer who is placing the health of his animals in serious danger and that irreparable harm will result absent a restraining order. As detailed above, the APHIS inspection reports, the veterinary records from the rescue organization, and declarations from USDA demonstrate that Gingerich has placed the health of his animals in serious danger in violation of the AWA, and its regulations and standards.

Irreparable harm occurs "when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). Gingerich's pattern and practice of providing substandard care to the dogs in his control or care has resulted and will continue to result in unnecessary suffering, serious illness, and even death. In light of Gingerich's history of evading USDA oversight and his unwillingness to make any substantial effort to come into compliance with the AWA, additional harm to his dogs is likely absent a restraining order. *See* Op. & Order at

29, *Lowe*, No. 20-cv-423, Dkt. 65 (finding in the alternative that defendants' continued failure to provide adequate care to their AWA-protected animals will result in irreparable harm absent injunctive relief). Such irreparable harm cannot be cured after the fact by monetary damages. Therefore, the irreparable harm prong weighs in favor of the United States.

When weighing the equities and public interest, the scale strongly tips in favor of ordering the relief that the United States has requested. Congress made clear in its AWA statement of policy that animals intended for use as pets must be provided humane care and treatment. *See* 7 U.S.C. § 2131(1). Moreover, it is always in the public interest for citizens to follow the law and not financially profit from their law-breaking endeavors. The public interest in preventing harm to animals, as evinced by Congress' intent in enacting the AWA, far outweighs the minimal impositions Gingerich, his agents, servants, employees, and other persons who are in active concert or participation with him will incur if the Court issues the restraining order and grants the relief requested. The United States has tailored its requested relief to reflect the AWA requirements that Gingerich agreed to comply with when he applied for and was granted an AWA license. Maxwell Decl. ¶ 3.

For the foregoing reasons, the Court should grant the United States' Motion for a Temporary Restraining Order.

## V.    CONCLUSION

The evidence is clear that Gingerich is a dealer placing the health of his dogs in serious danger in violation of 7 U.S.C. § 2159. Accordingly, a restraining order is mandated by the Act. The United States respectfully requests that the Court order Gingerich, his agents, servants, employees, and those working in active concert with him to: [6] (1) provide to undersigned counsel

---

[6] The United States respectfully requests that the Court exclude Dr. McClintock, Gingerich's attending veterinarian, and any veterinarian associated with his Country Village Animal Clinic in

within 7 days of the Court's order a list of every location at which they have any dogs that are intended for breeding or sale as of the date of the filing of this motion, *see* 9 C.F.R. § 1.1 (definition of dealer); (2) provide to undersigned counsel within 7 days of the Court's order an animal inventory for each location identified in paragraph (1), listing the breed, sex, age, and unique identification number, *see* paragraph (3), of each and every dog at each of the identified locations; (3) assign within 7 days of the Court's order a unique identification number to each dog listed on the inventories provided pursuant to paragraph (2), consistent with 9 C.F.R. § 2.50(a)(1); (4) ensure that, within 14 days of the Court's order, every dog listed on the inventories receives a "complete physical examination from head to tail," as required by 9 C.F.R. § 3.13(a)(2), by a licensed veterinarian other than Dr. William McClintock or any other veterinarian associated with Country Village Animal Clinic, Centerville, Iowa; (5) provide complete veterinary records for the "complete physical examinations" required by paragraph (4) and any veterinary care otherwise provided to any dog to undersigned counsel within 7 days of the animal being seen by a veterinarian; (6) provide to undersigned counsel within 7 days of the Court's order up-to-date written programs of veterinary care that comply with 9 C.F.R. § 2.40(b) and 3.13(a) for each location identified in paragraph (1); (7) ensure that a licensed veterinarian, other than Dr. William McClintock or any other veterinarian associated with Country Village Animal Clinic, Centerville, Iowa, documents the vaccination status of every dog identified in paragraph (2), timely vaccinates all dogs consistent with the vaccination schedule set out in the relevant written program of veterinary care, and accurately documents the vaccinations and make

---

Centreville, Iowa, on the basis that the veterinary care issues are so extensive at Gingerich's facility that it calls into question the care being provided by Dr. McClintock and/or the relationship between the veterinarian and Gingerich. The United States' concerns are further supported by Dr. McClintock's disciplinary history, which at a minimum calls into question the accuracy of documentation provided by Dr. McClinotck. *See* Ex. Y (McClintock Disciplinary Proceeding).

those documents available to USDA Animal and Plant Health Inspection Service inspectors upon request; (8) immediately cease from acquiring by birth or transfer or disposing by euthanasia or transfer any dogs listed on the inventories in paragraph (2) without the consent of the United States or a court order; (9) in the case of any dogs who were already pregnant at the time of the Court's order, provide notice to undersigned counsel within 72 hours of the birth of any puppies, including the number of puppies born, the identification number of the dam, and the identification numbers assigned to the puppies, *see* 9 C.F.R. § 2.50(a)(1); *see also* 9 C.F.R. § 2.75; and (10) if any dogs listed on the inventories provided pursuant to paragraph (2) die, have a licensed veterinarian, other than Dr. William McClintock or any other veterinarian associated with Country Village Animal Clinic, Centerville, Iowa, confirm the death in person and document the condition of the dog; the veterinarian's record of death must be provided to undersigned counsel with 72 hours of the death of the animal.

DATED: September 27, 2021

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division

/s/ Mary Hollingsworth
MARY HOLLINGSWORTH
Senior Trial Attorney
SHAMPA A. PANDA
Trial Attorney
United States Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
P.O. Box 7611, Ben Franklin Station
Washington, D.C. 20044-7611
Mary.hollingsworth@usdoj.gov | 202-598-1043
Shampa.panda@usdoj.gov | 202-598-3799
Fax: 202-305-0275
*Attorneys for the United States of America*

Richard D. Westphal
Acting United States Attorney

By: */s/David Faith*
David L.D. Faith II
Assistant United States Attorney
U.S. Courthouse Annex, Suite 286
110 E. Court Avenue
Des Moines, Iowa 50309
Telephone: (515) 473-9353
Facsimile: (515) 473-9282
Email: david.faith@usdoj.gov