# EXHIBIT C –
# Declaration of Heather Cole

**IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff*, <br> v. | Case No. |
| DANIEL GINGERICH | |
| *Defendant*. | |

## DECLARATION OF DR. HEATHER COLE

I, Heather Cole, declare the following to be true and correct to the best of my knowledge and based on my personal knowledge and on information collected from staff:

1.        I am employed with the United States Department of Agriculture (USDA), Animal and Plant Health Inspection Service (APHIS), Animal Care (AC), as a Supervisory Veterinary Medical Officer (SVMO). I have been working for AC for a total of 11 years and one month. I have been in my current supervisory position for three years and eight months.

2.        In my current role as a SVMO I supervise inspectors mainly in Iowa and Nebraska, but have occasionally added supervisory duties for inspectors in other states such as Missouri, Oregon, Montana, Ohio, etc. The inspectors I currently supervise mainly inspect commercial dog dealers, but also conduct inspections of research facilities, exhibitors, and transporters.

3.        Prior to my role as a SVMO, I worked as an AC Veterinary Medical Officer (VMO) mainly conducting inspections at commercial dog breeding facilities in Iowa. However, I also inspected other types of facilities, such as research facilities and exhibitors, and frequently

assisted in other states with a wide variety of facilities, including commercial dog breeding facilities.

4.      Daniel Gingerich is a class A licensee or breeder, which is a dealer whose business consists only of animals that are bred and raised at their facility. He holds license number 42-A-1632.  He has five licensed sites approved by USDA. In addition, he has at least 2-3 unlicensed sites. At all of these sites, Gingerich breeds dogs.

5.      I currently supervise inspectors that cover approximately 440 class "A" and "B" dealer facilities, with the vast majority dealing in dogs. I have supervised over 2,000 inspections and have personally conducted inspections of more than 500 dog dealer facilities in my 11-year tenure at the APHIS.

6.      During my tenure, I have never encountered a licensee who has this high of a level of chronic and repeat noncompliance across every category of Animal Welfare Act requirements (i.e., animals, facilities, and paperwork) and its implementing regulations and standards.  From a lack of accurate recordkeeping, to failure to provide adequate veterinary care leading to unnecessary suffering from preventable causes, to the poor physical state of the facilities, combined with Mr. Gingerich's unwillingness to appropriately correct the issues, Mr. Gingerich's facilities are the all-around least compliant facilities I have encountered.

7.      Mr. Gingerich has demonstrated a failure to adequately maintain acquisition and disposition records despite repeated citations. The failure to maintain and provide accurate records prevents USDA from tracking the movements of dogs to ensure their health and well-being.

8.      A number of dogs have developed severe illness and/or have died at Mr. Gingerich's facilities from disease

such as parvovirus and distemper. Parvovirus and distemper are easily prevented using common and widely available vaccines, given at appropriate timeframes, combined with proper cleaning, sanitizing, and husbandry practices. The dogs that died were not vaccinated appropriately for parvovirus and distemper in accordance with the programs of veterinary care, professionally accepted husbandry practices were not followed (e.g., proper vaccine storage), and facilities were not cleaned / sanitized and maintained appropriately. In my opinion as a veterinarian, I believe these inappropriate management practices led to the multiple disease outbreaks documented at Mr. Gingerich's kennels.

9.      Mr. Gingerich has chosen to euthanize dogs at his facilities in lieu of working with his attending veterinarian to perform diagnostics and/or develop treatment plans for easily diagnosable, treatable, and/or preventable diseases. Failure to consult with his attending veterinarian has led to many unnecessary deaths and euthanasia of adult dogs and puppies at his facilities.

10.     The dogs that are dying at Mr. Gingerich's facilities and the dogs that he is euthanizing are in poor condition because of easily treatable and preventable factors. These factors include not receiving adequate nutrition or enough potable water, not being vaccinated properly for diseases such as parvovirus and distemper, and the poor and unsanitary physical condition of the facilities in which the dogs are kept.

11.     Mr. Gingerich's adult and puppy death rate is exceptionally high for a commercial dog breeding facility. Death rates vary widely depending on husbandry practices, preventative care, and treatment protocols, however, from my experience inspecting commercial dog kennels, death rates, particularly in puppies at dog kennels, tend to be 10% or less at most breeding facilities. Due to the inadequate acquisition (including all births) and disposition records

(including all deaths) USDA is unable to obtain an accurate calculation of the rate of death loss at Mr. Gingerich's facilities. However, from the inspector's and my observations and vast experience with dog kennels, we believe the loss rate is considerably higher than what we have seen (approximately 10% or less) and what we would expect for a commercial dog breeding facility that provides proper care for their animals.

12.     In my experience, when licensees at severely noncompliant facilities are faced with repeated violations, the facilities cooperate with USDA to voluntarily surrender their animals and / or work with rescue organizations to donate their animals.

13.     USDA has had multiple conversations with Mr. Gingerich outlining the steps to voluntarily surrender his animals or donate his animals to rescue organizations.

14.     Under USDA guidelines, facilities where serious or severe noncompliances are identified at the time of inspection (i.e.," directs") are given very short timeframes within which to make corrections, typically 24-48 hours. The reinspection to ensure that the noncompliance has been corrected (either via a focused inspection of the area(s) of concern or a full/routine inspection assessing the whole facility) occurs within a short period of time after the correction date has passed. This timeframe for reinspection is typically one to a few days, but should not exceed 14 days. Inspectors are required to conduct a reinspection of the "direct" even if the issue was corrected during the initial inspection.

15.     In the period between when Mr. Gingerich has been first cited for failing to provide adequate veterinary care for certain dogs and when USDA inspectors have arrived at his facilities to

conduct a follow-up inspection, the dogs that Mr. Gingerich had been cited for have often disappeared or the inspectors have been unable to follow-up on the animals due to Mr. Gingerich's poor disposition and/or medical record-keeping practices. In many cases, Mr. Gingerich told the AC inspectors that the dogs had died in the intervening time period.

Under penalty of perjury, pursuant to 28 U.S.C. § 1746(2), I declare the foregoing to be true and correct to the best of my knowledge.

Executed on September 26, 2021.

Heather Cole, DVM
Supervisory Veterinary Medical Officer
USDA-APHIS, Animal Care