**IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff*, | |
| v. | Case No.  4:21-cv-00283-SMR-SHL |
| DANIEL GINGERICH | **PARTIAL OPPOSITION TO MOTION FOR TRANSFER OF ANIMALS** |
| *Defendant*. | |

## INTRODUCTION

The United States opposes in part Defendant's Application for Authorization of the Court for Immediate Release of Ownership to Animals Subject to Preliminary Injunction Herein to Third Party Animal Rescue. ECF No. 15. The United States agrees with Defendant Daniel Gingerich that he should "immediately be relieved of further responsibilities for the care, control, and management of all dogs under his care." ECF No. 15 ¶ 3.  The United States also agrees that this Court should "[a]uthorize the transfer of ownership of all dogs remaining in Defendant's possession." *Id*. ¶ 4.  But this is where the United States' agreement with Defendant's request ends.

The dogs should not be transferred to an unvetted out-of-state organization of Defendant's choice.  Despite daily communications with Defendant and eventually his counsel last week, Defendant failed to mention, let alone confer, with the United States regarding the proposed arrangements before Defendant filed his application Friday afternoon.  The United States does not have knowledge of Defendant's proposed facility, the LOVE Pet Project

1

("LOVEPet"), nor has it had an opportunity to investigate its capability to take in and properly care for this number of dogs, or that facility's relationship to the Defendant.

In contrast, the Animal Rescue League of Iowa ("ARL") has already assisted the United States in removing from Defendant's facilities and providing care for the thirty dogs and puppies that United States Department of Agriculture ("USDA") veterinarians determined last week to be in "acute distress."  It is ARL—Iowa's largest non-profit animal shelter with a staff of over 119 employees and 1,600 volunteers—that should receive the "189 dogs and puppies" Defendant has consented to the "permanent release and re-homing of."  ECF No. 15 ¶¶14, 19.  The Wayne County Sheriff's Office and the State of Iowa are governmental entities with independent interests in these dogs.  They support the United States' position that the dogs should not be transferred to a third-party organization that Defendant has hand-picked.  *See* Ex. A (Wayne County Sheriff's Office Letter) ("In light of Gingerich's actions regarding the treatment of the dogs at [Site 01], I have an interest in what happens to these dogs . . . placing the dogs at ARL will facilitate my ability to track the dogs as well as get information about their condition and treatment"); Ex. B (Iowa AG Letter of Support) (stating that the Iowa Department of Agriculture and Land Stewardship "cannot accept the [LOVEPet] Project proposal," as it "lacks a significant amount of information that would address [Iowa's] concerns.").

In sum, the United States applauds Defendant's decision to surrender at least some of his dogs. But the United States respectfully requests that the Court direct Defendant to surrender the animals to the United States (via ARL).[1] Certainly the Court should not authorize Defendant to

---

[1] The Court has the authority to permanently place Defendant's dogs with the United States as an equitable remedy pursuant to 7 U.S.C. § 2146(c) to prevent and restrain Defendant's further violation of the Act.  *Id*. ("The United States district courts . . . are vested with jurisdiction specifically to enforce, and to prevent and restrain violations of this chapter . . .").

dispose of any dogs without the consent of the United States unless and until he fully complies with the Court's orders and the United States has had an opportunity to fully vet the proposal.

## ARGUMENT

I.      **The Dogs should be Transferred to Animal Rescue League of Iowa, which is already providing care for the 30 dogs and puppies found to be in "acute distress"**

The 189[2] dogs that Defendant wishes to "immediately" be relieved of caretaking for should be removed from his facilities. But LOVEPet, an organization that Defendant—a party that has failed to show any regard for the welfare of the animals under his care has hand-picked—presents to the Court is not an acceptable placement for these dogs.[3]  The Court should order that these dogs be immediately transferred to ARL.

ARL is the largest nonprofit animal shelter in Iowa and has been registered as a 501(c)(3) charity since 1926. Ex. E ¶ 4.  It holds an Animal Welfare License from the State of Iowa and, therefore, is subject to state oversight regarding recordkeeping, vaccinations, enclosure space, sanitation, and cleaning.  *Id.* ¶ 5.  ARL has the physical facilities, through its four adoption centers and two animal shelters, and technical capacity, through its 102 full-time and 17 part-time employees and over 1,600 volunteers, to care for these dogs.  Ex. E ¶¶ 6, 7.

---

[2] The United States is unsure how Defendant came up with this number or to which dogs this number refers. On the locations list opposing counsel sent government counsel on October 13, 2021 and the incomplete inventories provided by Defendant, Defendant had 263 dogs at Site 01 alone. Ex. C at 2. Defendant has more than 200 additional dogs at other sites. *Id.* Thus, contrary to what Defendant implies in his motion, Ex. 15 ¶ 19, there are far more than 189 dogs at issue here. Moreover, Defendant's statement that "[t]he number and location of all dogs has been delivered to the counsel for the United States of America on October 14, 2021," *id.* ¶ 17, is inaccurate. Defendant failed to identify in that document the dogs still located at the following unlicensed site: 25316 Elk Chapel Rd., Lamoni, IA.

[3] The State of Iowa received via a third party a substantially similar letter from LOVEPet.  *See* Ex. D.  This letter is not on the organization's letterhead and has a noticeably different signature.

ARL has been working with the United States to provide much-needed veterinary care to the 30 dogs and puppies removed from Defendant's facilities on October 14 and 15. *Id*. ¶¶ 14-15.  The veterinary team at ARL is currently treating these dogs, whose issues include, "malnourishment, intestinal parasite infections, chronic eye disease, severe dental disease and respiratory issues." *Id.* ¶ 16.  ARL is currently preparing for "at least a third of the dogs from at least the 3125 Davis Road site [] to remain in Iowa for some period of time for evaluation and treatment," and is "prepared to care for those dogs in state for as long as is necessary to ensure their health and wellbeing." *Id.* ¶ 17.  ARL is currently working with reputable partner organizations, including the American Society for the Prevention of Cruelty to Animals ("ASPCA"), Wisconsin Humane Society, and Wayside Waifs, on plans to take care of the 189 dogs and transport a portion of them when they have been fully assessed and cleared for transportation out of state. *Id*. ¶ 18.

In contrast, the United States has no direct knowledge of LOVEPet or its capability to properly care for the dogs at issue.  Nor do we have any knowledge of Defendant's relationship or arrangement with the organization.  To the extent we have been able to glean from publicly available sources, LOVEPet is an infant organization that received its 501(c)(3) designation in February 2020, Ex. F, and does not have readily available information regarding a board of directors, their financials, or any other transparent policies.  *Cf.* https://humanepro.org/sites/default/files/documents/RescueGroupBestPracticesGuide.pdf (Humane Society of the United States Rescue Group Best Practices Guide) (last visited Oct. 17, 2021).  LOVEPet states that adoption fees for dogs and puppies "range" up to $1,800, which is substantially more than the average fees collected by rescue organizations. *See* https://thelovepetproject.wordpress.com/about/ (last visited Oct. 17, 2021).  It does state that the

adoption fees are to cover the medical costs for the dogs, but the amount of fees and this individualized adoption fee table raise a number of red flags, including if this organization has the financial capacity to care for these dogs which have only had "shockingly inadequate" care from Defendant. ECF No. 4 at 5.[4]  The United States does not want to transfer these dogs from a woefully inadequate situation based on Defendant's say-so only to find out his chosen receiving facility also cannot properly care for the dogs.

Defendant makes a point to state that both he and the organization he has hand-selected intend to quickly dispose of the dogs before he complies with the Court's orders. ECF No. 15 ¶¶ 8, 16, and at page 4 (relief). Swift disposal of numerous dogs by a bad actor and the organization he has selected is troubling. If Defendant cares about the health and welfare of his dogs, as he now claims, he should have no problem surrendering those dogs to an experienced organization who is committed and prepared to treat the many dogs with medical conditions in state for as long as it takes until they are ready for adoption.

Moreover, Defendant should not be rewarded for his contempt of the law by being allowed to dispose of the dogs that would help establish whether the documents he must submit to the Court are in fact true and accurate. USDA put Defendant on notice of these requirements months ago. Thus, he should have no problem complying with the requirements by the October 27, 2021 deadline. In the meantime, ARL can ensure that each and every dog is thoroughly assessed and any animals of concern can be treated in Iowa, which is substantially more conveniently for all interested parties.

---

[4] Defendant has not proffered a declaration regarding the bona fides or capabilities of the LOVEPet Project.  Instead, Defendant attaches an unverified letter from LOVEPet purporting to outline its background and plans for handling the dogs upon transfer.  The letter is hearsay and the United States has not had sufficient time to investigate the veracity of its representations.

## II.     Defendant should be given no decision-making power over the placement of his dogs

This Court should not allow Defendant to have any decision-making power over where these dogs end up, let alone dictate the third-party organization where these dogs go, because his representation that his "primary concern" is for "the safety, management, and care of his animals," ECF No. 15 ¶ 14, is directly contradicted by his actions.

As this Court has already found, Defendant has "repeatedly evaded, or attempted to evade" attempts by the USDA to ensure his dogs were provided the humane care they are legally owed under the Animal Welfare Act ("AWA") and its implementing regulations and standards. ECF No. 4 at 2.  Defendant's evasion has included "denial of access to his sites," "numerous violations and instances of non-compliance" when USDA inspectors were finally able to "obtain access to some sites," and the provision of "shocking[ly] inadequate" veterinary care to his dogs. *Id.* at 3–5.

The "expressed [] desire to cooperate with the [United States]" to address noncompliance with the AWA that Defendant demonstrated before this Court during the October 8, 2021 hearing, ECF No. 12 at 1, has not manifested.  He has continued to show a blatant disregard for the welfare of his dogs.  *See e.g.*, Ex. G (Declaration of Dr. Autumn Unck) ¶ 3 (An employee reported a "coughing puppy, but [Defendant] had said the dog was fine and did not need to go to the vet.").  And despite "agree[ing] to surrender any dogs in his possession which were in 'acute distress,' as determined by a [USDA] veterinarian" when "asked by the Court," ECF No. 12 at 1, Defendant was defiant and uncooperative when two USDA veterinarians, Dr. Autumn Unck and Dr. Bill Janecke, and USDA inspector Kelly Maxwell arrived at his 3125 Davis Road facility on

October 13, 2021.  His behavior and actions during this one afternoon are powerful evidence that he has not suddenly started caring about his dogs but is merely maneuvering again at a minimum to avoid having to account for all of his dogs and otherwise comply with this Court's orders.

At several points during the October 13, 2021 inspection, Defendant was asked about the health of certain dogs and puppies but had no medical records to provide evidence of treatment or even information of what treatment and exams had been given.  For example, USDA "identified two adult dogs who had severe eye conditions" to which Gingerich replied that a veterinarian had "g[iven] [the dogs] a clean bill of health."  Ex. H (Declaration of Kelly Maxwell) ¶ 5.  But, when asked for the dogs' medical records "showing the results" of these exams, Defendant "said he did not have them."  *Id.*  When asked "what day the exam occurred," Defendant stated that he "did not know."  *Id*; *see also id.* ¶ 4 (When asked for medical records since birth of a Golden retriever puppy with a severe hacking cough, Defendant replied "I don't know if there are any records.").

Far from being cooperative, when a USDA veterinarian determined that a dog or puppy was in acute distress, Defendant actively fought her conclusions. Ex. G ¶¶ 4-6, 8 (describing how, when Dr. Autumn Unck explained to Defendant how she determined that certain dogs were in "acute distress," Defendant asked "with an agitated tone" how they could be in distress, "insisted" that his veterinarian had given a "clean bill of health," and "demanded multiple times" that Dr. Unck explain how the puppies were in acute distress).  Once the inspection was completed and Defendant was given a copy of this Court's Order ordering him to surrender all dogs that a USDA veterinarian determines was in "acute distress," he "became extremely agitated and distressed and demanded to speak to the Department of Justice attorneys."  Ex. H ¶ 8.  Defendant then "had his driver move the vehicle to behind a building, so that [USDA] could

no longer see him." Ex. G ¶ 8.  Concerned that Defendant "may be doing something to the dog we found in acute distress that was located in the building," USDA then "moved our vehicle to an area" where they could "see" Defendant.  Ex. G ¶ 8.

When Kelly Maxwell informed Defendant that ARL was "on the way" to transport the dogs that Defendant was required to surrender, Defendant "stormed off" and then returned to say in an "angry, frustrated voice" that his veterinarian was "on his way" and that "no dog is leaving until my vet examines them." Ex. H ¶ 9.  Defendant's veterinarian, which "appeared to be Dr. Couchman at the Animal Health Centre located in Centreville, Iowa" then appeared with his stethoscope. *Id*.  Defendant's vet "was in [the sheltered housing building] for approximately 10 minutes and then returned to his car and left the property."  *Id*.  Defendant did not just stop at trying to get a veterinarian of his own choice to refute USDA's "acute distress" determination—after being informed that all of the dogs and puppies the USDA vet found to be in "acute distress" were subject to surrender, he called the Wayne County Sheriff's Office and "requested that a Deputy [sheriff] be sent to his facility" because "Gingerich wanted the Deputy sheriff to give their own assessment of the condition of the dogs at the site." Ex. A.

While this inspection was taking place, ARL employees were in the Wayne County Sheriff's Office "wait[ing] to hear from [USDA] how many dogs were determined to be in 'acute distress' and thus subject to removal."  *See id*.  A deputy sheriff was dispatched alongside ARL to remove the dogs, and when they arrived at the facility Defendant "informed [the] deputy sheriff that he did not want ARL on his property." *See id*.  The deputy sheriff had to then "escor[t] ARL onto the property to facilitate removal of the dogs."  *See id*.

Defendant's actions during the course of this one afternoon alone demonstrate that he should have no part in determining the placement of these dogs.[5]

Providing further evidence that Defendant should not be allowed to determine where these dogs go are his own false statements to the USDA.  The United States was informed in writing that Joe Miller, the site manager for Defendant's licensed facility located at 3125 Davis Road, had resigned his position at the facility.  *See* Ex. I (Joe Miller Letter).  In the letter, addressed "[t]o USDA, State of Iowa, and any other concerned party," Miller states that he "notified Daniel Gingerich while [Gingerich] was in Seymour, IA that I was resigning from my position as caretaker of his animals," and that Miller "can not support Daniel's practices and behavior."  *See id.*  The letter is dated October 12, 2021, and signed by Miller.  But when a USDA veterinarian asked Defendant on October 13, 2021, who was going to take care of the animals at this site now that Miller was gone, he replied that "[Joe] had not resigned but was just taking vacation for a week but would be coming back."  Ex. G ¶ 7.

Defendant has shown no interest in providing his animals with any care, let alone that his "primary concern" is for "the safety, management, and care of his animals."  ECF No. 15 ¶ 14.  Against the backdrop of this pattern of attempting to evade enforcement of the law, Defendant should not now be given the opportunity to decree which organization these dogs end up in.

---

[5] After this inspection, USDA "determined that [the inspectors] must have a security escort with [them] at all of the remaining inspections of Daniel's facilities due to: (1) Daniel's angry, frustrated, and stressed behavior which could result in a dangerous situation for the inspection team; (2) [the inspection team's fear] that Daniel would harm or attempt to euthanize a dog after a USDA veterinarian had determined that the dog was in "acute distress" but while waiting for ARL to arrive on the site to transport the dogs; and (3) Daniel had called the Wayne County Sheriff's Office on us after the inspection ..."  Ex. H ¶ 11.

## III.     Defendant's contempt for the law should not be rewarded

The United States has demonstrated in this and other briefing that not only does Defendant have a history of repeatedly violating the AWA, causing the unnecessary suffering of many animals and even some deaths, but also that his statements and actions repeatedly call into question his credibility.  Most recently, he has added to that list by engaging in bad faith negotiations.  The Court should not now reward this behavior by granting relief to a "gotcha" motion filed at 3:53 PM CDT on Friday, particularly when Defendant's counsel failed to comply with the meet and confer requirement of Local Rule 7(k), despite being on the phone with government counsel just an hour before filing the motion.

During the October 8, 2021 hearing, the Court directed the United States and Defendant to work together to come up with a creative solution to provide for a resolution of this matter and the welfare of these dogs. The United States did just that. When Defendant claimed that he was going to surrender the dogs at Site 01 to Wayne County, Iowa, we immediately conferred with the County Sheriff regarding the County's plans so that we had enough information to consent to the transfer of the dogs. *See* Ex. J (Declaration of Mary Hollingsworth) ¶¶ 3, 4. We conveyed our consent to that plan within 24 hours of being notified about it. *Id.* ¶ 7. It is our understanding that those dogs would have been picked up by today and would already be receiving the care they deserve. *Id.* ¶ 4.

When Defendant started walking back that offer to surrender the dogs to Wayne County, and instead decided he first wanted to come to an agreement with the United States, we pivoted to that plan. Defendant initially stated that he was preparing with some assistance of counsel a proposal to address the dogs. *See id.* ¶ 7. Defendant never shared a proposal with us. Defendant then requested that we prepare a proposal, which we did within two days of his request. *See id.*

10

¶¶ 8, 9, 15. Defendant directed us to send the proposal to opposing counsel. *Id.* ¶ 14. Both Defendant and opposing counsel represented that opposing counsel's firm had been retained for "email services." *Id.* ¶ 16.  Defendant represented to us around 4:30 p.m. CDT on Thursday, October 14, 2021, that he still had not retained counsel, but that he would return to the law firm Friday morning to review the draft agreement and would share a counter proposal after that, if needed. *Id.* ¶ 15.

On that same day, government counsel was alerted to the fact that one of Defendant's site managers, Jacob Stutzman, at an unlicensed site had informed the USDA inspectors at his site that he wanted the United States to take possession of the dogs. *Id.* ¶ 13. He no longer wished to be involved with Defendant and did not want to take care of the dogs. *Id.* Government counsel immediately contacted Defendant, who clearly had no plan for those dogs, and offered to take the dogs right away. Defendant declined and claimed he would inform the government of his plans for the dogs and seek approval for the transfer of the dogs in advance of taking any steps. *Id.* To date, we do not know if those dogs remain at the unlicensed site or who is caring for them.

Minutes after opposing counsel entered an appearance, government counsel reached out by phone to confirm that he had received the draft agreement that we sent the day before and to raise some pressing issues regarding the welfare of certain dogs. *Id.* ¶ 18. Opposing counsel confirmed that he had received the draft agreement that the government had sent the day before but represented that he had not been able to reach his client to provide him with a copy. *Id.* We again raised the issue of the approximately 20 dogs at Mr. Stutzman's site. *Id.* We noted that the dogs had no bedding, most were housed outside, and some of the dogs were in an area that had no roof and was missing a wall. *Id.* We further noted that Defendant had refused to allow us to take the dogs and had yet to present us with a plan for where and how those dogs would be cared

for. We again offered to pick the dogs up that day. After discussing other outstanding issues, Mr. Byrne said he would look into these matters. However, he never got back to us.

Instead, about an hour after the call, opposing counsel filed the motion at issue here. Southern District of Iowa Local Rule 7(k) states that "[a]ll nondispositive motions must contain a representation that counsel for the moving party personally has conferred in good faith with counsel for all other parties."  Because defense counsel did not confer with the United States, under Local Rule 7(k), the motion "must contain a description of the efforts made to consult with the party and an explanation of why the efforts were unsuccessful." Conspicuously absent from Defendant's motion is any such statement. The fact is that at no point during our conversation with opposing counsel did he mention, let alone confer "in good faith" with counsel, Defendant's intent to file his application to the Court. LR7k.  Likewise, Defendant made no mention that he had made arrangements with LOVEPet to receive his dogs, even though it is clear that Defendant had to have been in ongoing discussions with LOVEPet for some time prior to filing his application.

Defendant appears to be hoping that the Court will overlook the fact that he has not yet complied with the Court's orders and, in general, his poor track record for complying with the law.  But any deference to Defendant's preferred facility is improper. In his motion, Defendant asks the Court to allow him to dispose of his dogs quickly by surrendering them to an unvetted organization about which there is limited information. Defendant then attempts to cast the outstanding requirements as mere administrative tasks. ECF 15 at 4 (relief). However, the requirements that Defendant produce complete and accurate inventories and acquisition and disposition records are not a paperwork exercise. At a minimum, hundreds of dogs have vanished in the last few months from Defendant's possession. Dkt. 1 ¶¶ 44-47. Complete and accurate

inventories, which identify the breed, sex, age, and unique identification number of each and every dog at issue in this case, compared against acquisition and disposition records and, if necessary, the dogs themselves are vital to determine if Defendant has disposed of or relocated dogs in violation of the USDA license suspension and subsequently this Court's temporary restraining order.  In addition, when the dogs are fully assessed by competent veterinarians, the information Defendant is required to provide will help the veterinarians determine whether a dog is, for example, in good shape for a senior dog or in terrible condition for a three-year old dog.

The Court can ensure the health and wellbeing of the dogs while still ensuring that justice is served here by authorizing the transfer of the dogs to the United States via ARL.

## IV.     Defendant has repeatedly refused to surrender his dogs to the United States and other governmental entities

Providing further support for the United States' position, the United States has consistently and repeatedly informed Defendant that it is willing and able to accept his dogs, but Defendant has refused to surrender his dogs to the United States.

When USDA arrived on October 14, 2021, at Defendant's unlicensed site at 12340 240th St., Lamoni, IA 50140, managed by Jacob Stutzman, Stutzman informed USDA that he was "not interested in taking care of Daniel's dogs that were at this location anymore" because "the dogs were a lot of work, were destructive, and that he was constantly spending money trying to fill the holes in the enclosures that the dogs were digging."  Ex. H ¶ 14.  Stutzman said that he was "interested in the dogs leaving today," *id*., and that he was "no longer willing to care for these dogs," Ex. G ¶ 9.  After this statement, USDA became "very concerned for the welfare of the dogs" because all of the dogs at this location were housed outdoors, there was no bedding in any of the shelters, and the temperature was "get[ting] down to 30-40 degrees at night with wind chill."  Ex. G ¶ 10.  Expecting many more dogs to become ill over the next few days under these

conditions, USDA "asked Stutzman if he was willing to have [the United States] take the dogs today," to which Stutzman replied that he did.  *Id*.

DOJ attorneys then called Defendant to explain that Stutzman no longer wanted the dogs on his property and was not willing to care for them, and asked Defendant if he would agree to the United States taking the dogs. Ex. J ¶ 13.  Defendant stated that he would come up with a plan for the dogs and that he would get back to DOJ about what to do with the dogs. *Id.*  DOJ reiterated that, if Defendant could not take care of the dogs or was unwilling to do so, the United States was willing and able to immediately take the dogs.  *Id*.  Defendant declined to surrender his dogs at that time.  *Id*.  Defendant called DOJ nine more times on October 14, 2021.  *Id*. ¶ 14.  When government counsel spoke with him, we asked about the dogs at Stutzman's site, but Defendant repeated just that he would come up with a plan for them. *Id*.

The United States has made multiple follow-up efforts to ensure that the dogs at this site are being cared for.  As already noted, government counsel contacted opposing counsel regarding Jacob Stutzman's dogs on October 15, 2021, shortly after opposing counsel entered an appearance.  At 3:51 PM CDT, the United States sent correspondence to defense counsel titled "United States of America v. Gingerich: response requested by EOD for veterinary care and care issues," again asking for an update on the dogs at Stutzman's site. Government counsel also notified opposing counsel about an eight-week old Pomeranian puppy that, the United States had just learned from the State of Iowa, which conducted its own inspection of Defendant's site at 3125 Seymour Road on October 15, 2021, was in need of immediate veterinary care.  *See* Ex. L. Based on the information provided by the State, the United States believed the dog was in "acute distress," but at that late hour on a Friday was unable to send a USDA veterinarian to Site 01 to make the finding. Thus, seeking some cooperation from Defendant, the United States stated that

it could "make arrangements to transport" the Pomeranian puppy as well as the dogs at Stutzman's site. *See id.* As of the time of filing, the United States has yet to receive a response to this email, and Defendant has yet to provide any information about who, if anyone, is caring for the dogs.

Defendant has also refused to actually surrender any dogs to the Wayne County Sheriff's Office—despite being the one to initially make the "offer[] to surrender all of his dogs located at [3125 Davis Road, Seymour, IA 52590]." Ex. A. On October 11, 2021, Defendant called the Wayne County Sheriff to surrender all of the approximately 260 dogs at Site 01. He "talked to [the Sheriff] about wanting to pick the place that the dogs would go to, but [the Sheriff] rejected that idea." *Id.* Instead, the Sheriff "worked with [ARL] to prepare for [this] anticipated surrender," and, by the end of the day on October 11, the Sheriff had "in partnership with ARL" planned for "the anticipated surrender to occur on October 18, 2021." *Id.* The next day, Defendant called DOJ attorneys about the surrender to the Sheriff's Office and asked if the United States would consent to him surrendering the dogs at Site 01 to a rescue he was familiar with who would then "divvy up" the surrendered dogs to other rescues. Ex. J ¶ 7. Government counsel explained that the United States would consent to the transfer of the dogs at Site 01 but, given Defendant's past actions and based on DOJ's conversations with the Sheriff, DOJ did not believe it would be an option for Defendant to choose where the surrendered dogs from Site 01 would go because there needed to be "some distance between the dogs and Gingerich and his sphere." *Id.*[6] Defendant then "stopped communicating" altogether with the Sheriff's Office about the surrender. Ex. A.

---

[6] Government counsel did advise Defendant that, regarding the remaining dogs, we would consider any proposal he shared with us. *Id.* ¶ 7. Defendant several times represented that he was going to provide such a proposal and then later that he would review the government's draft

Defendant's posturing about the surrender of his dogs at Stutzman's site and at Site 01 make clear that he should have no part in determining where the dogs end up.

## **CONCLUSION**

Defendant has a history of mistreating his animals and contempt for the law. Just one month ago he threatened that he would "just . . . euthanize" a number of dogs if USDA would not allow to him to give them "to anyone he wants." ECF No. 2, Ex. B (Declaration of Kelly Maxwell) ¶ 39. Nothing has changed. Although the United States and other governmental entities have offered multiple times to relieve Defendant of his responsibilities—indeed, the dogs he wants to dispose of now could have already been removed—Defendant wants to maintain control. He is sending the same message to this Court now that he sent to USDA then: he has no intention of taking care of his dogs, and the Court should immediately allow him to do what he wants with the dogs or the dogs will not be cared for. The Court should not reward Defendant's bad behavior.

This Court should grant Defendant's motion insofar as it relates to the transfer of 189 dogs from his facilities but deny Defendant's request to hand-pick the organization that these dogs go to. The Court should instead order Defendant to surrender 189 dogs and puppies to the United States for placement with ARL.[7]

---

consent decree and provide a counter-proposal, if necessary. However, until Defendant filed the instant motion, the United States had not received any specific information from Defendant let alone his proposal. The government was certainly provided no meaningful opportunity to vet Defendant's proposal.

[7] If the Court is inclined to allow the dogs to be placed with LOVEPet, the Court should not allow for any such transfer unless and until: (1) Defendant establishes he has come into full compliance with all of the existing requirements of this Court's orders in the temporary restraining order and preliminary injunction; and (2) the United States has had the opportunity to issue a subpoena to and review documents from LovePET about, *inter alia*, its members and

DATED: October 18, 2021

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division

/s/ Shampa A. Panda
SHAMPA A. PANDA
Trial Attorney
United States Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
P.O. Box 7611, Ben Franklin Station
Washington, D.C. 20044-7611
MARY HOLLINGSWORTH
Senior Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Division
999 18th Street, South Terrace, Rm. 370
Denver, CO 80202
Mary.hollingsworth@usdoj.gov | 202-598-1043
Shampa.panda@usdoj.gov | 202-598-3799
Fax: 202-305-0275

*Attorneys for the United States of America*

---

board of directors, the origination of donations, and any financial or in-kind arrangements and/or benefits relating to the transfer of these 189 dogs to its facilities.

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically filed the foregoing with the Clerk of Court and all parties using the CM/ECF system.

DATE: October 18, 2021

/s/ Shampa A. Panda

Shampa A. Panda