# EXHIBIT J –

# Mary Hollingsworth Declaration

# IN THE UNITED STATES DISTRICT COURT FOR
# THE SOUTHERN DISTRICT OF IOWA
# CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff*,<br>v.<br><br>DANIEL GINGERICH,<br><br>*Defendant*. | Case No. 4:21-CV-00283-SMR-SHL |

### AFFIDAVIT OF MARY HOLLINGSWORTH IN SUPPORT OF THE UNITED STATES' PARTIAL OPPOSITION TO APPLICATION FOR AUTHORIZATION OF THE COURT FOR IMMEDIATE RELEASE OF OWNERSHIP TO ANIMALS SUBJECT TO PRELIMINARY INJUNCTION HEREIN TO THIRD PARTY ANIMAL RESCUE

I, Mary Hollingsworth, hereby state as follows:

1. I represent the United States in the above-captioned case. I submit this declaration in support of the United States' Partial Opposition to Defendant's motion for transfer some of his dogs. I have personal knowledge of the facts stated in this declaration and, if called upon to do so, could and would testify competently thereto.

2. I am duly licensed to practice law in Arizona and am a Senior Trial Attorney in the Wildlife and Marine Resources Section of the U.S. Department of Justice's ("DOJ") Environment and Natural Resources Division. I have been employed by DOJ since 2011.

3. On Monday, October 11, 2021, I received an email from Wayne County Sheriff D. Keith Davis, stating that Daniel Gingerich had just offered to surrender his dogs in Wayne

1

County, Iowa located at 3125 Davis Rd. Seymour, IA 52590 (Site 1) to the County. The Sheriff notified me that the Animal Rescue League ("ARL") would accept the approximately 260 dogs. I immediately asked Sheriff Davis if we could speak by phone and he agreed. We discussed the proposed plan and I said that we would consent to the proposed disposition of animals provided that Mr. Gingerich understood that the surrender would not result in a dismissal of the federal case. I explained that there were still many other dogs outside Wayne County and other legal requirements with which Mr. Gingerich had to comply. Sheriff Davis stated he would call Mr. Gingerich back right away to confirm that he understood the terms of the agreement with the County.

4. My colleague, Shampa Panda, and I then called ARL and spoke with the organization's Chief Executive Officer, Tom Colvin, to confirm the organization's capacity to care for the dogs. Mr. Colvin or an ARL staff member stated that they could pick up the dogs as early as Thursday, October 14, 2021, and asked whether we thought they should begin to mobilize with that date in mind. I responded that Mr. Gingerich had not finalized the agreement with the County yet and, thus, it was unlikely that the transfer of dogs would happen as soon as October 14, 2021. ARL then started making plans for removing the dogs on October 18, 2021.

5. Later in the day on October 11, 2021, I called Sheriff Davis again to ask if he had reached Mr. Gingerich. He stated he had tried calling him twice but was unable to reach him.

6. On October 12, 2021, I received an email from Sheriff Davis stating that he had spoken with Mr. Gingerich and that Mr. Gingerich had several questions concerning the surrender of the dogs. He had advised Mr. Gingerich to call me.

7. Shortly after receiving the email from Sheriff Davis, Ms. Panda and I called Mr. Gingerich to address his questions. At the beginning of the call, we asked Mr. Gingerich if he

was represented by legal counsel and stated he was not. We reminded him that we represent the United States and that our client's interests are directly adverse to his. Mr. Gingerich informed us that he was traveling to Iowa and was in the process of drafting a settlement agreement with the assistance of legal counsel. We informed Mr. Gingerich that we would review and consider any settlement offer he sent us. We then confirmed that we had spoken with the Sheriff and would consent to the transfer of the dogs at Site 1 to Wayne County. We stated that the transfer would not resolve the federal case, but that it was a good start. Mr. Gingerich asked if the United States would consent to him surrendering the dogs to a rescue broker of his choice. He stated he was familiar with a rescue broker who would take the surrendered dogs and "divvy them up" to licensed and permitted rescues. We explained to Mr. Gingerich that it would be important for the United States to know exactly where the dogs were going, and reiterated that under the temporary restraining order entered by the Court no dogs could be moved from their current location without first receiving consent from the United States or the Court. We then stated that we had spoken with the Sheriff and based on our discussions we did not believe it would be an option for him to choose the location of where the surrendered dogs would go. We explained, given his past behavior and actions, everyone felt it was important that there be some distance between the dogs and Mr. Gingerich and his sphere. We told Mr. Gingerich that for the dogs located at sites other than Site 1, he could submit information to us regarding his proposal and that we would consider it, but it was unlikely that we would agree to allow him to choose where the dogs would be transferred. Mr. Gingerich never identified an organization. Nor did he submit to us a settlement proposal.

8. Mr. Gingerich called us again later that same day—October 12, 2021—and requested that we send him a settlement agreement to review. We stated that we were working

on a draft and would send it to him as soon as we could. Mr. Gingerich also represented that he would send the complete inventory, including ages, for all dogs at the licensed and unlicensed sites, and veterinary records for all of those dogs via email. To date, the United States has not received complete and accurate documentation.

9. On Wednesday, October 13, 2021, I received numerous calls from Mr. Gingerich. There are at least a dozen calls between the parties from that day. Each time Ms. Panda and I spoke with Mr. Gingerich, he asked when he would be receiving the draft settlement agreement. We explained that we had to have the document reviewed by our management and the U.S. Department of Agriculture ("USDA"), but assured him that we would send it as soon as we could, likely Thursday morning. During one call, Mr. Gingerich requested my email address to send the veterinary records. Although Ms. Panda's and my email addresses were listed on the filings in Mr. Gingerich's possession, I provided the address again.

10. The morning of October 13, 2021, USDA forwarded a letter from Site 1 manager, Joe Miller, that had been submitted by an Amish leader. Ex. I. Mr. Miller's letter stated that Gingerich visited Site 1 on October 12, 2021, and during that visit, Mr. Miller had resigned from his position as caretaker of Gingerich's animals. Mr. Miller went on to say that he could "not support Daniel's practices and behavior." *Id.* He also provided his new address in Wisconsin. *Id.*

11. On the afternoon of October 13, 2021, a team of USDA inspectors visited Site 1. Mr. Gingerich was present at the time. After the Court entered the order granting the preliminary injunction, I emailed the order to the inspectors to print and provide to Mr. Gingerich. Ms. Panda and I then called Mr. Gingerich and notified him of the Court's order, the inspectors' findings regarding the condition of some of the animals at Site 1, and informed him that those dogs who were in "acute distress" would be removed that day. Mr. Gingerich became defensive and said

4

that he had a veterinarian on the way. I understood Mr. Gingerich to be arguing that we could not take the dogs because he had now decided to get them veterinary care. We explained to Mr. Gingerich that, per his representations to the Court and the Court's Order, once the "acute distress" finding had been made by a USDA veterinarian, he was required to surrender the dogs. Mr. Gingerich acknowledged that and then hung up on me. We immediately tried to call Mr. Gingerich back several times but he did not answer. I then called Kelly Maxwell, one of the inspectors on site. She told me that Mr. Gingerich was moving a vehicle and she was not sure if he was leaving the site or going to a different part of the site.

12. Mr. Gingerich finally responded to our follow up calls later that afternoon. I immediately noted that he had hung up on us and that we had more to discuss. He stated that he hung up on us because he was receiving a call on the other line. Mr. Gingerich again asked us when we would be sending the settlement agreement. We said that we were working on it but that any settlement would be dependent on him complying with the Court's order, including providing complete and accurate inventories for every licensed and unlicensed location. I let him know again that it would likely be the next day before we could get it to him. I noted that we still had not received a copy of the veterinary records that he brought with him to the October 8, 2021 hearing and asked when he would be providing the documents and complete inventories to us. He stated he would have the documents emailed to us that day. We did not receive any emails from Mr. Gingerich or anyone working on his behalf.

13. On Thursday, October 14, 2021, around 12:45 p.m. CDT, I received a call from USDA inspector Kelly Maxwell. She indicated that the USDA inspectors were currently at an unlicensed site managed by Jacob Stutzman. She stated that Mr. Stutzman no longer wanted to take of Mr. Gingerich's dogs and he wanted USDA to remove them from his site. Ms. Panda

and I called Mr. Gingerich to discuss the matter with him. Mr. Gingerich stated that he was at the attorney's office. We immediately asked if he had representation in the matter. He responded, that he had not "retained" counsel. We explained to him that if he is retaining counsel we cannot speak to him and that we must speak to the attorney. I suggested that he put the call on speaker phone if the attorney was there. I do not know if he did that. I explained to him that Jacob Stutzman no longer wanted the animals on his property and said he did not want to care for them. I told him that Mr. Stutzman had asked us to take all of the dogs that belonged to Mr. Gingerich and that we were willing and able to do so. Mr. Gingerich said he would come up with a plan for the dogs. I reminded him that he could not move the dogs without first obtaining our consent. He acknowledged that and said he would get back to us in a few hours about what to do with the dogs. I told him that if he believes he cannot take care of the dogs or is unwilling to do so, we would take the dogs right away. Mr. Gingerich declined to surrender the dogs to us at that time. I called Kelly Maxwell back and asked her to put Mr. Stutzman on the phone. I explained to him that I understood that he no longer wanted to care for the dogs, that he had requested that USDA take the dogs, however, Mr. Gingerich had declined to surrender the dogs to us and said that he would be in touch with Mr. Stutzman soon about the dogs.

14.    I received nine more calls from Mr. Gingerich on October 14, 2021, most of which were calls that I missed. Ms. Panda and I spoke with Mr. Gingerich two more times that day. Because Mr. Gingerich had mentioned that he had been speaking with an attorney, each time we started a call we asked if he had retained counsel for this matter and each time he said he had not. During each call we asked about the dogs at Mr. Stutzman's and he said that he would deal with the dogs and that he understood he could not move them without first speaking with us. During each call, Mr. Gingerich asked us if we would be sending the draft settlement agreement

that day. During the call around 3 p.m. CDT, we explained that USDA had wanted to send a settlement proposal for the administrative case filed against Mr. Gingerich at the same time so he would have both documents to review at the same time. We explained that we were still waiting on USDA's documents. Mr. Gingerich directed us to email the draft settlement agreement to an address he provided for the law firm Winston & Byrne.

15. On October 14, 2021 at around 4:00 p.m. CDT, Ms. Panda mailed the draft settlement agreement to Ms. Gingerich via Michael Byrne and copied me. At around 4:30 p.m. CDT, Ms. Panda and I called Gingerich and once again asked him if he had retained counsel. He said he had not. We explained to him that USDA was still preparing settlement documents for the administrative action, but that we had decided to send the draft settlement agreement anyway so as not to delay resolution of this matter. Mr. Gingerich replied that he had already left the attorney's office but that he would return to the attorney's office the next morning and would review the document and would get us his proposal after that.

16. I received an email from the law firm Winston & Byrne on the afternoon of Thursday, October 14, 2021. The email stated that the "office is providing email services for Daniel Gingerich pursuant to his telephone conversation with you this afternoon." Ex. K (emphasis added). Michael Byrne went on to state that: "It is my understanding that Mr. Gingerich has provided you with this email address for return correspondence particularly involving a settlement offer from your office to resolve the injunctive relief issue." *Id.*

17. On Friday, October 15, 2021, I missed one call from Mr. Gingerich at around 11:30 a.m. CDT. Ms. Panda and I attempted to return the call around 1:30 pm. CDT, but Mr. Gingerich did not respond. About thirty minutes later, Mr. Byrne filed a notice of appearance on behalf of Mr. Gingerich.

18. At 2:15 p.m. CDT, about fifteen minutes after Mr. Byrne filed a notice of appearance, Ms. Panda and I called him to discuss some outstanding issues and to confirm he had received the draft settlement agreement that we had sent the day before. Mr. Byrne confirmed that he had received the draft agreement but represented to us that he had not been able to reach his client to provide him with the draft agreement. We once again raised the issue of the dogs at Mr. Stutzman's site. We explained that the dogs were housed outside without any bedding and that a number of the dogs were housed in an area that had no roof and was missing a wall. We stated that with the temperatures starting to drop the dogs would be in acute distress soon. We let him know that his client had stated he would get back to us the day before regarding the dogs, that we had offered to take the dogs, and that Ms. Stutzman had told the United States that he no longer wanted the dogs on his property. We also raised Ms. Gingerich's violation of the Court's order by continuing to breed dogs at his sites. We asked that he direct his client to immediately separate the male and female dogs. We have not received confirmation that Ms. Gingerich has separated all the male and female dogs at all the sites. We also discussed other outstanding issues related to the Court's orders.

19. At no point during our conversation with Mr. Byrne did he mention that he was preparing to file a motion to dispose of the dogs to a third party that had never been identified by Defendant. The United States never received the counter proposal that Defendant represented he was going to send after reviewing with Mr. Byrne our draft settlement agreement. Instead, a little over an hour later, Mr. Byrne filed the motion, Dkt. 15.

20. At 5:30 p.m CDT, Ms. Panda and I sent a follow up email again trying to determine Gingerich's plan for the dogs at Mr. Stutzman's site. Ex. L. In addition, we informed Mr. Byrne that the State of Iowa (Iowa Department of Agriculture and Land Stewardship) had

8

inspected Site 1 earlier that day and had just let us know that their veterinarians identified a puppy who "was showing signs of distress by heavy breathing, nasal discharge, and was acting lethargic." *Id.* Because it was Friday afternoon, we were unable to arrange for a USDA veterinarian to go to the site to make the determination that the puppy was in "acute distress." We asked Mr. Byrne to provide evidence by the end of the day that Mr. Gingerich had sought immediate veterinary care for the puppy as the State of Iowa had directed him to do and asked if Mr. Gingerich would be willing to voluntarily surrender the puppy to the United States so that we could immediately send someone from ARL to the site to pick up the dog. To date, Mr. Byrne has not responded to our email or request for information regarding the welfare of these dogs.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 17th day of October, 2021.

                                                                                                        MARY HOLLINGSWORTH
Senior Trial Attorney
U.S. Department of Justice